# EXHIBIT A

RECEIVED
DEC 2 8 1992
C.M.

## OFF-SITE SPECIALIST PHYSICIAN
## INDEPENDENT CONTRACTOR AGREEMENT

**THIS AGREEMENT** is entered into this 1st day of December, 1992, by and between Graham and Hanson, D.D.S., ("SPECIALIST"), and ARA HEALTH SERVICES, INC., a Missouri corporation, d/b/a/ CORRECTIONAL MEDICAL SYSTEMS, ("CMS").

**WHEREAS,** the Missouri Department of Corrections ("DOC"), has contracted with CMS to provide for the health care needs of inmates in its correctional facilities ("CORRECTIONAL CONTRACT"); CMS desires to engage the services of SPECIALIST and SPECIALIST desires to accept such engagement; SPECIALIST and CMS agree as follows:

**1. CORRECTIONAL MEDICAL ENVIRONMENT.** SPECIALIST will cooperate with CMS personnel and contractors to promote the efficient use of medical facilities located within the correctional facilities.

**2. SPECIALIST SERVICES.** SPECIALIST will provide to referred patients medically necessary physician services in the specialized field of Oral and Maxillofacial Surgery. Authorization and the scope of authorized services must be obtained from a designated CMS PRIMARY CARE PHYSICIAN.

**3. LICENSES & CERTIFICATIONS.** SPECIALIST certifies that he/she is a physician duly licensed by the State of Missouri, is Board Certified or Board Eligible in his specialty and will notify CMS immediately of any changes in such licensure or certification. SPECIALIST will comply with the CMS Credentialing Procedure and will provide required credential documentation on a timely basis.

**4. INDEPENDENT CONTRACTOR RELATIONSHIP.** CMS and SPECIALIST are Independent Contractors. This Agreement shall not be construed to create any other relationship nor to suggest that CMS is engaged in the practice of medicine.

**5. COMPENSATION.** CMS will compensate SPECIALIST for medically necessary off-site services at the rate of 100% of the billed charges of the SPECIALIST as indicated by his fee schedule on file with the Missouri DOC.

1

**6. CLAIMS FOR PAYMENT.** SPECIALIST must submit claims within 120 days from the date of treatment. Payment of claims submitted thereafter will be denied. If the CORRECTIONAL CONTRACT is terminated for any reason, SPECIALIST must submit all outstanding claims within sixty (60) days from the date of written notice of termination. Payment of claims submitted thereafter will be denied. Payment for medically necessary services will be made within sixty (60) days of receipt by CMS of properly documented claims. Separate claims must be submitted per patient per episode of treatment. All claims must include the following:

1. Patient Name & I.D. Number
2. Patient Date of Birth
3. Date(s) of Service
4. Name & Tax I.D. Number of SPECIALIST
5. ICD-9 Diagnostic Code(s) & Description(s)
6. CPT-4 Procedure Code(s) & Description(s)
7. A Detailed Billing of Charges

A properly completed HCFA-1500 form is an acceptable, but not required, claim form in conjunction with a detailed billing of charges.

**7. RIGHT OF RECOVERY.** CMS assumes responsibility for payment of services rendered secondary to primary sources of insurance or health & welfare benefits. SPECIALIST will identify and seek payment from all other primary sources prior to seeking payment from CMS. SPECIALIST will not seek payment from the inmate patient nor from the State, County or City agency or political subdivision responsible for inmate patient health care unless the inmate patient or State, County or City agency is responsible for the patient.

**8. UTILIZATION MANAGEMENT.** The CMS Utilization Management Department (UMD) reviews and verifies that medically necessary services are rendered efficiently and in the most cost-effective setting appropriate to the medical condition. Except in emergencies arising during the course of authorized treatment, SPECIALIST shall provide medical services only upon the prior written referral of the CMS PRIMARY CARE PHYSICIAN. SPECIALIST will cooperate with the policies and procedures of the UMD and will assist with Hospital communications. CMS will notify SPECIALIST of any changes in its program.

**9. UTILIZATION REVIEW.** SPECIALIST will ensure that services rendered are reasonable and medically necessary services performed efficiently. SPECIALIST will ensure that inpatient diagnostic procedures, consultations and inpatient surgeries are scheduled within twenty-four (24) hours with prior approval of the CMS Medical Director. SPECIALIST will permit CMS to review services rendered and will provide CMS with patient information and documents necessary in ascertaining medical necessity and length of stays. Payment for unauthorized or inappropriate services may be adjusted or denied upon review by the UMD. Disputed claims adjudications may be appealed.

2

**10. APPEALS PROCESS.** The Appeals Process is initiated by SPECIALIST through the CMS UMD. The appeal must be submitted in writing within sixty (60) days of the date of the original denial and must contain the following:

Required Information

Name of Patient & I.D. Number
Date(s) of Service
Provider Name & Tax I.D. Number
Claim Number (if possible)
A Brief Explanation of the Problem
Supportive Documentation

Address

Attn: Appeals Division
Utilization Management Dept.
CORRECTIONAL MEDICAL SYSTEMS
999 Executive Parkway
St. Louis, MO 63141

Appeal will be reviewed initially for supportive information and documentation. If the appeal cannot be granted on initial review, it will be referred to the Appeals Division which will render a decision within thirty (30) days. Only one (1) appeal per case will be considered.

**11. SECURITY ARRANGEMENTS.** SPECIALIST will cooperate with all security measures as may be required and provided by the DOC. CMS is not responsible for providing security for referred patients.

**12. MEDICAL RECORDS.** SPECIALIST and CMS agree to keep confidential and take all reasonable precautions to prevent the unauthorized disclosure of records required to be prepared or maintained by law or by this Agreement. Prior to treatment SPECIALIST will obtain from patients all necessary releases to enable the release of medical records and/or information to CMS and its agents. SPECIALIST will permit CMS and its agents to inspect medical records maintained on referred patients and will provide copies to CMS on request.



**13. INSURANCE.** SPECIALIST will maintain professional liability insurance coverage for itself, its employees, agents, officers and contractors with limits of not less than $500,000 per occurrence and $1,500,000 in the aggregate on a claims-made basis, with SPECIALIST purchasing all necessary tail coverage. SPECIALIST will provide CMS with proof of insurance on request and will notify CMS of any changes in coverage or liability limits within thirty (30) days of such change.

**14. CONFIDENTIALITY & NON-COMPETITION.** SPECIALIST will maintain the confidentiality of all business or trade information obtained by it through its relationship with CMS. SPECIALIST will not bid, nor otherwise compete against CMS in the market of contract correctional health care services in Missouri during this Agreement.

3

**15. NOTICES.** TO SPECIALIST:

        Graham & Hanson, D.D.S.
        1400 Southwest Blvd.
        Jefferson City, MO 65101

TO CMS:

    John Hilburn
    Vice President
    CORRECTIONAL MEDICAL SYSTEMS
    999 Executive Parkway
    St. Louis, MO 63141

**16. TERM OF AGREEMENT.** This Agreement begins December 1, 1992, continues for one (1) year and shall continue in one (1) year terms. At any time and for any reason, either party may notify the other of its intent to terminate this Agreement; provided that SPECIALIST shall complete treatment of patients then receiving care. This termination will be effective ninety (90) days after it has been received, in writing, certified mail, return receipt requested.

**IN WITNESS WHEREOF,** the parties hereto have executed this Agreement as of the day and year first written above.

**GRAHAM & HANSON, D.D.S.**

_____
RICHARD F. GRAHAM, D.D.S.

_____
JONATHON G. HANSON, D.D.S.

_____
    12/24/92
    DATE

_____
  1400 Southwest Blvd.

  Jefferson City, MO  65109

_____
    ADDRESS

_____
   43-1011514
   FEDERAL ID NUMBER

**ARA HEALTH SERVICES, INC. d/b/a
CORRECTIONAL MEDICAL SYSTEMS**

_____
JOHN HILBURN, VICE PRESIDENT

_____
    1–4–93
    DATE

C:\CMS\CONTRACT\GRAHANSN
11-09-92

4

**MEDICAL GROUP SERVICES AGREEMENT**
**BETWEEN**
**CORRECTIONAL MEDICAL SERVICES, INC.**
**AND**
**MID MISSOURI ANESTHESIA CONSULTANTS, P.C.**

## RECITALS

**THIS MEDICAL GROUP SERVICES AGREEMENT** ("Agreement"), is made and entered into as of the 17th day of November, 2008 ("Effective Date"), by and between **CORRECTIONAL MEDICAL SERVICES, INC.**, a Missouri corporation ("Company") with principal offices located at 12647 Olive Boulevard, Saint Louis, Missouri 63141-9052 and **MID MISSOURI ANESTHESIA CONSULTANTS, P.C.**, a Missouri based professional corporation ("Medical Group") with principal offices located at 1445 Christy Drive, Jefferson, Missouri 65101. This Agreement supersedes and replaces any existing agreements between Medical Group and Company to the extent such agreements relate to the provision of Health Care Services to Patients.

**WITNESSETH:**

**WHEREAS,** Company has a contract to provide or to arrange for the provision of Health Care Services to certain correctional facility patients and detainees in the custody of the Missouri Department of Corrections ("Client"); and

**WHEREAS,** Medical Group's physicians are licensed in the State of Missouri; and

**WHEREAS,** Company desires to engage, and Medical Group desires to provide Health Care Services to the correctional facility patients and detainees in the custody of the Client, all on the terms and conditions set forth herein.

**NOW THEREFORE,** for and in consideration of the mutual covenants, promises, and payments as are hereinafter set forth, and other good and sufficient consideration, the sufficiency of which is hereby acknowledged by the parties, Company and Medical Group hereby agree as follows:

### SECTION 1
### Definitions

1.1    **Definitions**. Capitalized terms used herein shall have the meanings ascribed thereto in the Definitions List, attached hereto as Exhibit A, or as otherwise parenthetically identified throughout this Agreement.

quality of care standards as they may reasonably relate to the Health Care Services rendered to Patients hereunder.

**2.6** **Compliance with Applicable Law**. Medical Group agrees that all Health Care Services provided by or through Medical Group pursuant to this Agreement, and documentation thereof, will be in compliance with applicable law and certification or licensure requirements.

**2.7** **Security**. Medical Group shall cooperate with all necessary security arrangements whether provided by the Client or such other duly qualified security or law enforcement agency.

## SECTION 3
## Compensation of Medical Group

**3.1** **Compensation for Services**. Medical Group will be compensated for Health Care Services rendered at the lesser of Eligible Charges or as set forth in the Compensation Schedule, attached hereto as Exhibit B. Medical Group agrees to abide by American Medical Association and Medicare billing and coding guidelines.

**3.1.1** **Claims Review.** Completed Claims for professional services are reviewed by a clinical software system during payment processing. This review detects, corrects, and documents improper coding, including unbundling, upcoding, and fragmentation using Medicare National Correct Coding Initiative and/or CPT coding guidelines, and adjusts reimbursement accordingly. Completed Claims questioned by the clinical software may be reviewed by a nurse analyst and appropriate documentation to substantiate questioned charge(s) may then be requested.

**3.2** **Claims Submission**. To be eligible for compensation under this Agreement, Medical Group must submit a Completed Claim for each episode of Health Care Services provided to a Patient. A Completed Claim must be submitted within ninety (90) days of the service rendered. Completed Claims submitted after ninety (90) days shall be permanently denied. Completed Claims in paper form should be sent to the following address:

> Correctional Medical Services, Inc.
> Claims Department
> PO Box 411243
> St. Louis, MO 63141
> Phone: (800) 395-3500, ext. 9135

Company will also accept the electronic filing of CMS-1500 forms. When submitting CMS-1500 forms via an electronic format, Medical Group should use the Company payer identification number 43160 and include the Department of Corrections Inmate Number in box 1A of the CMS-1500 form.

**3.3** **Appeal Process**. In the event that a dispute arises concerning the resolution of a Completed Claim, Medical Group may appeal by submitting the dispute to Company in writing,

with supporting documentation, within thirty (30) calendar days following Company's response or denial of the Completed Claim. Company shall provide a reply and Medical Group shall initiate appropriate action, if any, within thirty (30) days following receipt of Company's response. If Medical Group fails to dispute in writing Company's handling of a Completed Claim within thirty (30) calendar days following receipt of Company's response, then such claim may be considered waived and Company shall not be obligated to make any payment or adjustment thereafter.

**3.4** **Patient Verification**. Except for Emergency Services, Medical Group will not provide Health Care Services to any Patient unless the Patient has been referred for care by the Company contracted on-site physician. Medical Group is responsible for verifying that an individual who presents for services is a Patient and has been referred by the Company contracted on-site physician to the Medical Group for Health Care Services.

**3.5** **Right of Recovery**. Medical Group will not seek reimbursement from the Patient or from the Client without Company's written consent.

**3.6** **Prior Services & Payments**. If Medical Group has performed services for Company patients prior to the Effective Date of this Agreement, and Company has compensated Medical Group for these services, Medical Group agrees to accept the amounts previously paid by Company as full and final reimbursement for services rendered prior to the Effective Date of this Agreement.

**SECTION 4**
**Term and Termination**

**4.1** **Term**. The term of this Agreement will commence on the Effective Date and will continue in effect for one (1) year ("Initial Term") and shall automatically renew for recurring one (1) year terms thereafter, subject to termination of the Agreement as provided herein.

**4.2** **Termination.**

**4.2.1** **Termination without Cause**. Subsequent to the Initial Term, either party hereto may notify the other party of its intent to terminate this Agreement, by providing written notice of termination to the other party. Such termination will be effective on the 1st of the month following ninety (90) days after the receipt of such notice by the non-terminating party.

**4.2.2** **Termination for Cause**. Company may terminate this Agreement with Medical Group for cause, including but not limited to the occurrence of any of the following events, which has not been cured within thirty (30) days after written notice from Company.

**4.2.2.1** Medical Group has breached any of the material terms and conditions of this Agreement or the exhibits or attachments hereto; or

Case 2:22-cv-04191-MDH   Document 16-1   Filed 01/06/23   Page 8 of 60

**4.2.2.2** Any activities or actions of Medical Group that, in the reasonable judgment of Company, are deemed to be detrimental to Company.

**4.2.3** **Immediate Termination**. Company may immediately terminate this Agreement upon the occurrence of any of the following events:

**4.2.3.1** The failure of Medical Group (or any employee, agent or independent contractor utilized by Medical Group) to meet or maintain any of the qualification requirements specified in this Agreement or any misrepresentation by Medical Group of Medical Group's qualifications; or

**4.2.3.2** Medical Group's failure to maintain required insurance as provided in this Agreement; or

**4.2.3.3** Medical Group's inability to meet his or her obligations pursuant to this Agreement due to financial insolvency, bankruptcy, or lack of capacity to provide Health Care Services.

**4.2.4** **Termination of Company/Client Contract**. This Agreement shall terminate upon expiration or termination of the Company/Client Contract.

## SECTION 5
## Insurance and Indemnification

**5.1** **Medical Group's Insurance**. At all times during the term of this Agreement and any renewals hereof, Medical Group shall maintain or cause to be maintained adequate professional liability insurance with limits of not less than one million dollars ($1,000,000) per occurrence and three million dollars ($3,000,000) in annual aggregate, and such insurance shall be occurrence-based coverage, or if claims-made coverage, Medical Group agrees that upon the expiration or termination of this Agreement for any reason, Medical Group will maintain insurance coverage for any liability directly or indirectly resulting from Medical Group's provision of services in connection with this Agreement, or any other acts or omissions of Physician occurring in whole or in part during the term of this Agreement (hereinafter "Continuing Coverage"). Medical Group may procure Continuing Coverage by obtaining subsequent policies which have a retroactive date of coverage equal to the Effective Date of this Agreement, by obtaining an extended reporting endorsement ("tail") applicable to the insurance coverage maintained by Medical Group during the term of this Agreement, or by such other methods as are mutually agreed upon by Medical Group and Company. The insurance obtained pursuant to this Section, including any Continuing Coverage, will cover all employees, independent contractors, and agents of Medical Group who provide Health Care Services to Patients, against any and all claims, actions, judgments, liabilities, losses, damages, costs, and obligations (including attorneys' fees) which are attributable to or which arise, directly or indirectly, out of any act or omission by Medical Group and/or his or her employees, independent contractors, or agents. Without limiting the obligations of Medical Group under this Section, the insurance maintained or caused to be maintained pursuant to this Section will provide coverage

against civil actions based on medical treatment brought under 42 U.S.C. § 1983, and as that statute may be amended, modified, recodified, or succeeded in the future.

**5.2** **Company's Insurance**. At all times during the term of this Agreement and any renewals hereof, Company shall maintain professional liability policies of insurance in amounts and with coverage similar to that required of Medical Group hereunder.

**5.3** **Certificates**. Medical Group shall, within ten (10) days after execution of this Agreement and on an annual basis thereafter, provide to Company certificates issued by an insurance carrier or its agent evidencing that the insurance policies required under this Agreement are in effect. Medical Group shall provide Company with at least thirty (30) days prior written notice of any modification, cancellation, or non-renewal of such policies.

**5.4** **Indemnification**. Medical Group shall indemnify and hold harmless Company from and against any and all claims, suits, liabilities, damages, and expenses (including attorneys' fees) against Company which are based upon the acts and/or omissions of Medical Group and/or any of Medical Group's employees, agents, officers, or contractors in connection with the performance of this Agreement.

**5.5** **Survival**. This Section 5 "Insurance and Indemnification" shall survive termination of this Agreement for any reason.

## SECTION 6
## Relationship of the Parties

**6.1** **Relationship of the Parties**. The relationship of Medical Group to Company is that of independent contractor. Nothing contained herein shall create an employer-employee, principal-agent, or partnership relationship between Company and Medical Group or between Company and any employee, agent, or independent contractor of Medical Group. Company shall not exercise control or direction over the manner in which Medical Group or any employee, agent, or independent contractor of Medical Group renders services. Nothing contained herein shall interfere with the physician-patient relationship between Medical Group and any Patient, or with Medical Group's legal or ethical obligation to provide the proper standard of care to Patients.

**6.2** **Non-Compete**. Medical Group acknowledges that Company has expended considerable time, effort, and resources in developing its services to serve the Client and to enable Medical Group to provide Health Care Services to the Patients; accordingly, to the extent permitted by the Company/Client Contract, Medical Group agrees that during the term of this Agreement Medical Group shall not divert, take away, or interfere with Company's relationship with Client nor shall Medical Group seek, offer, solicit, or accept an engagement to provide Health Care Services, directly or indirectly, to the Client or for the Patients, whether individually on Medical Group's own behalf or acting as an employee, independent contractor, agent, representative or otherwise, of the Client or a third party, without the prior written consent of Company. Medical Group represents and warrants that the enforcement of the provisions of this

Section, by way of injunction, will not prevent the Medical Group or its physicians from earning a livelihood and the provisions of this Section are necessary to protect the interests of Company.

**6.3    Non-Disclosure.** Company and Medical Group recognize that during Medical Group's association with Company, Medical Group has been and will continue to be brought into contact with the confidential methods of operation and trade secrets of Company, including, without limitation, know-how, data and other information about its operations and business of a confidential nature; that such information gives to the relationship a special and unique value. Therefore, Medical Group agrees that during the term of this contractual relationship with Company and thereafter, Medical Group will not in any manner, directly or indirectly, disclose or divulge to any person, entity, firm or company or use for Medical Group's own benefit or the benefit of any other person, entity, firm or company, directly or indirectly in competition with Company any knowledge, information, business methods, techniques or data of Company including the terms of this Agreement unless specifically provided for herein. This Section shall survive termination of this Agreement.

**6.4    Non-Exclusivity.** This Agreement is a non-exclusive arrangement. Except as agreed between the parties under Section 6.2 hereunder, Medical Group may participate in other affiliations and render such other Health Care Services as Medical Group determines to be in his or her interest. Medical Group acknowledges that Company must contract with other professional health care providers for the purpose of fulfilling its obligations pursuant to the Company/Client Contract.

**6.5    Medical Records.** Medical Group agrees to prepare comprehensive medical records for each Patient to whom Medical Group provides Health Care Services. Each such medical record shall contain sufficient information to identify the Patient, establish a diagnosis and medical classification, support the diagnosis, identify and justify the treatment, and document the results of such treatment. Medical records prepared by Medical Group during the term of this Agreement will be maintained in accordance with applicable state and federal laws governing confidentiality and medical record retention. Medical Group will allow Company complete access to such medical records as permitted by law. Medical Group will allow Company and its health care professionals access to such medical records without cost to Company. This Section shall survive termination of this Agreement.

## SECTION 7
### Construction of Agreement

**7.1    Assignment.** Medical Group's rights and duties under this Agreement, whether in whole or in part, may not be assigned, delegated, or transferred without the prior written consent of Company.

**7.2    Amendments.** This Agreement may be amended only by written agreement signed by the parties hereto.

**7.3** **Section Headings**.  The headings of sections in this Agreement are for reference only and shall not affect the meaning of this Agreement.

**7.4** **Entire Agreement**.  This Agreement, inclusive of any and all amendments, attachments and exhibits, which are all incorporated herein by this reference, constitutes the entire understanding and agreement between the parties with regard to the subject matter hereof. No other prior or contemporaneous promise, obligation, statement or understanding between the parties, whether written or oral, shall be valid or binding.

**7.5** **Binding Effect**.  This Agreement shall be binding upon and inure to the benefit of each party hereto, and their successors and permitted assigns.  No party may assign this Agreement, except as specifically provided otherwise herein.

**7.6** **No Third Party Beneficiary Rights**.  No Patient, nor the Client, nor any other non-party shall have any third party beneficiary rights hereunder.

**7.7** **Non-Waiver**.  Failure to insist upon strict compliance with any of the terms or conditions of this Agreement shall not be deemed to be a waiver in the event of any future breach of any term or condition hereunder.

**7.8** **Severability**.  Should any provision (or part thereof) of this Agreement be held to be invalid and/or unenforceable, the remaining provisions shall remain in full force and effect.

**7.9** **Notices**.  Any notice required hereunder (including notice of an amendment of this Agreement) shall be sent by registered or certified mail (return receipt requested), personal delivery, overnight commercial carrier, or other guaranteed delivery.  The notice shall be effective as of the date of delivery if the notice is personally delivered, or the date of receipt or refusal to accept receipt if the notice is forwarded by other means.  Unless otherwise specified, notices shall be sent to:

> "Company"
> Correctional Medical Services, Inc.
> 12647 Olive Boulevard
> St. Louis, Missouri  63141
> Attn:  Chief Operating Officer
>
> "Medical Group"
> Mid Missouri Anesthesia Consultants, P.C.
> 1445 Christy Drive
> Jefferson City, Missouri 65101
> Attn:  Office Manager

**7.10** **Non-Discrimination**.  No party hereto shall discriminate on the basis of race, color, sex, religion, national origin, ethnic group, age, state of health, need for health services, place of residence, or handicap.

**7.11     Multiple Counterparts**.  The parties may execute this Agreement in any number of counterparts, and each counterpart will, for all purposes, be deemed to be an original instrument, but all such counterparts together will constitute the same Agreement.  At the request of any party, the parties will confirm facsimile transmitted signatures by signing an original agreement.

**7.12     Name, Symbol and Service Mark**.     During the term of this Agreement, Company shall have the right to use Medical Group's name solely to make public reference to Medical Group as a contracted provider for Client.   Medical Group and Company shall not otherwise use each other's name, symbol or service mark without prior written approval.

**7.13     Governing Law**. This Agreement shall be governed by the laws of the State of Missouri, without giving effect to its conflicts of law provisions.


**[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]**

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the Effective Date. If no date is listed in the Recitals, the last date entered below shall be the Effective Date of the Agreement.

| COMPANY | MEDICAL GROUP |
|---|---|
| **CORRECTIONAL MEDICAL SERVICES, INC.** | **MID MISSOURI ANESTHESIA CONSULTANTS, P.C.** |

_(signature)_

**Signature**                                    **Signature**

Keka Sanborn
**Print Name**

JANET C. Buschjost
**Print Name**

V.P. of Contracting
**Title**

Administrator
**Title**

12/24/08
**Date**

11-24-08
**Date**

43-1383899
**Federal Tax Identification Number**

**Payment and Remit Address**

Mid Missouri Anesthesia Consultants, P.C.
**Name**

1445 Christy Drive
**Street Address**

Jefferson City, MO 65101
**City, State, Zip**

573-636-3483
**Phone Number**

# EXHIBIT A
## DEFINITIONS

**Company/Client Contract** means the agreement entered into between Company and the Client whereby Company has agreed to provide or arrange for the provision of Health Care Services to the inmates and detainees in the custody of the Client.

**Company Medical Director** means the physician designated as the Company Medical Director for each correctional facility or other site served by Company.

**Completed Claim** means a timely claim for reimbursement of Health Care Services which contains at least the following items of information and is billed on an industry standard claim form (CMS-1500): (1) Patient Name and Department of Correction or Booking Identification Number; (2) Patient Date of Birth; (3) Date(s) of Service; (4) Physician's Name, Tax Identification Number, and National Provider Identifier (NPI); (5) ICD-9 Diagnostic Code(s) and Description(s); (6) Industry Standard Procedure Code(s) and Description(s); and, (7) Detailed Billing of Charges.

**Customary Charge** means the usual and customary fees charged by Medical Group for the particular service that is performed, which do not exceed the fees Physician would charge any other person.

**Eligible Charges** mean the amount of Medical Group's Customary Charges from which any reduction is taken for purposes of payment. Eligible Charges do not include amounts that are billed but that are duplicative, incorrectly coded, improperly coded, or that have similar defects, errors, irregularities or mistakes in billing. Eligible Charges also do not include charges for procedures or services that are not Medically Necessary or were unauthorized under this Agreement.

**Emergency Medical Condition** means a medical condition manifesting itself by acute symptoms of sufficient severity such that the absence of the immediate medical attention could reasonably be expected to result in placing the health of a Patient in serious jeopardy, serious impairment to bodily functions, or serious dysfunction of any bodily organ or part or such other urgent condition that constitutes an Emergency Medical Condition.

**Emergency Services** means those Health Care Services, which are Medically Necessary and provided for the treatment of an Emergency Medical Condition.

**Health Care Services** means the hospital, physician, medical and related services and supplies provided to a Patient by Medical Group which are Medically Necessary and are requested by the Company contracted on-site physician.

**Medically Necessary** describes those services which are determined to be: (a) Appropriate for the treatment of a Patient's medical condition; (b) provided for the diagnosis or care and treatment of a Patient's medical condition; (c) in accordance with the applicable

Case 2:22-cv-04191-MDH   Document 16-1   Filed 01/06/23   Page 15 of 60

# OFF-SITE SPECIALIST PHYSICIAN
## INDEPENDENT CONTRACTOR AGREEMENT

**THIS AGREEMENT** is entered into this 10th day of October, 1995, by and between CAPITOL EYE CARE, INC, d.b.a. **MATTHEW LEWIS** and **JAMES LUETKEMEYER**, 1820 SW BLVD, Jefferson City, MO 65109 ("SPECIALIST"), and CORRECTIONAL MEDICAL SERVICES, INC., ("CMS").

**WHEREAS,** the MISSOURI Department of Corrections, (DOC) has contracted with CMS to provide for the health care needs of inmates in its correctional facilities ("CORRECTIONAL CONTRACT"); CMS desires to engage the services of SPECIALIST and SPECIALIST desires to accept such engagement; SPECIALIST and CMS agree as follows:

**1. CORRECTIONAL MEDICAL ENVIRONMENT.** SPECIALIST will cooperate with CMS personnel and contractors to promote the efficient use of medical facilities located within the correctional facilities.

**2. SPECIALIST SERVICES.** SPECIALIST will provide to referred patients medically necessary physician services in the specialized field of OPHTHALMOLOGY. Authorization and the scope of authorized services must be obtained from a designated CMS PRIMARY CARE PHYSICIAN.

**3. LICENSES & CERTIFICATIONS.** SPECIALIST certifies that he/she is a physician duly licensed by the state of MISSOURI, is Board Certified or Board Eligible in his specialty and will notify CMS immediately of any changes in such licensure or certification. SPECIALIST will comply with the CMS Credentialing Procedure and will provide required credential documentation on a timely basis.

**4. INDEPENDENT CONTRACTOR RELATIONSHIP.** CMS and SPECIALIST are Independent Contractors. This Agreement shall not be construed to create any other relationship nor to suggest that CMS is engaged in the practice of medicine.

**5. COMPENSATION.** CMS will compensate SPECIALIST for medically necessary off-site services based on standard insurance guidelines at the rate of 100% of the covered charges of the SPECIALIST, as per the attached fee schedule.

**6. CLAIMS FOR PAYMENT.** SPECIALIST must submit claims within ninety (90) days from the date of treatment. Payment of claims submitted thereafter will be denied. If the CORRECTIONAL CONTRACT is terminated for any reason, SPECIALIST must submit all outstanding claims within sixty (60) days from the date of written notice of termination. Payment of claims submitted thereafter will be denied. Payment for medically necessary services will be made within forty-five (45)) days of receipt by CMS of properly documented claims. Separate

1

claims must be submitted per patient per episode of treatment. All claims must include the following:

1. Patient Name & I.D. Number
2. Patient Date of Birth
3. Date(s) of Service
4. Name & Tax I.D. Number of SPECIALIST
5. ICD-9 Diagnostic Code(s) & Description(s)
6. CPT-4 Procedure Code(s) & Description(s)
7. A Detailed Billing of Charges

A properly completed HCFA-1500 form is an acceptable, but not required, claim form in conjunction with a detailed billing of charges.

**7. RIGHT OF RECOVERY.** CMS assumes responsibility for payment of services rendered secondary to primary sources of insurance or health & welfare benefits. SPECIALIST will identify and seek payment from all other primary sources prior to seeking payment from CMS. SPECIALIST will not seek payment from the inmate patient nor from the State, County or City agency or political subdivision responsible for inmate patient health care unless the inmate patient or State, County or City agency is responsible for the patient.

**8. UTILIZATION MANAGEMENT.** The CMS Utilization Management Department (UMD) reviews and verifies that medically necessary services are rendered efficiently and in the most cost-effective setting appropriate to the medical condition. Except in emergencies arising during the course of authorized treatment, SPECIALIST shall provide medical services only upon the prior written referral of the CMS PRIMARY CARE PHYSICIAN. SPECIALIST will cooperate with the policies and procedures of the UMD and will assist with Hospital communications. CMS will notify SPECIALIST of any changes in its program.

**9. UTILIZATION REVIEW.** SPECIALIST will ensure that services rendered are reasonable and medically necessary services performed efficiently. SPECIALIST will ensure that inpatient diagnostic procedures, consultations and inpatient surgeries are scheduled within twenty-four (24) hours with prior approval of the CMS Medical Director. SPECIALIST will permit CMS to review services rendered and will provide CMS with patient information and documents necessary in ascertaining medical necessity and length of stays. Payment for unauthorized or inappropriate services may be adjusted or denied upon review by the UMD. Disputed claims adjudications may be appealed.

**10. APPEALS PROCESS.** The Appeals Process is initiated by SPECIALIST through the CMS UMD. The appeal must be submitted in writing within sixty (60) days of the date of the original denial and must contain the following:

2

| Required Information | Address |
|---|---|

<table>
<tr><td>
Required Information

Name of Patient & I.D. Number
Date(s) of Service
Provider Name & Tax I.D. Number
Claim Number (if possible)
A Brief Explanation of the Problem
Supportive Documentation
</td><td>
Address

Attn: Appeals Division
Utilization Management Dept.
CORRECTIONAL MEDICAL SERVICES, INC.
12647 Olive Boulevard
St. Louis, MO 63141-6345
</td></tr>
</table>

Appeal will be reviewed initially for supportive information and documentation. If the appeal cannot be granted on initial review, it will be referred to the Appeals Division which will render a decision within thirty (30) days. Only one (1) appeal per case will be considered.

**11. SECURITY ARRANGEMENTS.** SPECIALIST will cooperate with all security measures as may be required and provided by the DOC. CMS is not responsible for providing security for referred patients.

**12. MEDICAL RECORDS.** SPECIALIST and CMS agree to keep confidential and take all reasonable precautions to prevent the unauthorized disclosure of records required to be prepared or maintained by law or by this Agreement. Prior to treatment SPECIALIST will obtain from patients all necessary releases to enable the release of medical records and/or information to CMS and its agents. SPECIALIST will permit CMS and its agents to inspect medical records maintained on referred patients and will provide copies to CMS on request.

**13. INSURANCE.** SPECIALIST will maintain professional liability insurance coverage for itself, its employees, agents, officers and contractors with limits of not less than one million ($1,000,000.00) per occurrence and three million ($3,000,000.00) in the aggregate on a claims-made basis, with SPECIALIST purchasing all necessary tail coverage. SPECIALIST will provide CMS with proof of insurance on request and will notify CMS of any changes in coverage or liability limits within thirty (30) days of such change.

**14. CONFIDENTIALITY & NON-COMPETITION.** SPECIALIST will maintain the confidentiality of all business or trade information obtained by it through its relationship with CMS. SPECIALIST will not bid, nor otherwise compete against CMS in the market of contract correctional health care services in MISSOURI during this Agreement.

**15. NOTICES.**

TO SPECIALIST:

MATTHEW LEWIS, M.D.
1820 SW BLVD
Jefferson City MO 65109

TO CMS:

CORRECTIONAL MEDICAL SERVICES, INC.
12647 Olive Boulevard
St. Louis, MO 63141-6345

3

**16. TERM OF AGREEMENT.** This Agreement begins October 10, 1995, continues for one (1) year and shall continue in one (1) year terms. At any time and for any reason, either party may notify the other of its intent to terminate this Agreement; provided that SPECIALIST shall complete treatment of patients then receiving care. This termination will be effective ninety (90) days after it has been received, in writing, certified mail, return receipt requested.

**IN WITNESS WHEREOF,** the parties hereto have executed this Agreement as of the day and year first written above.

CORRECTIONAL MEDICAL SERVICES, INC.

_____
NAME

Presidens ; CEC
TITLE

10/2/95
DATE

_____
NAME

Regional Manager
TITLE

11/16/95
DATE

Capitol Eye Care Inc.
Central Missouri MEDICAL PARK
1705 Christy DR. #101
Jefferson City Mo 65101
ADDRESS

43-1614607
FEDERAL ID NUMBER

C:\CMS\contract\
genspec

4

# Capitol Eye Care, Inc.

Matthew T. Lewis, M.D.
James G. Luetkemeyer, M.D.
*Fellows, American Academy of Ophthalmology*
*Diplomates, American Board of Ophthalmology*

Central Missouri Medical Park
1705 Christy Drive, Suite 101
Jefferson City, Missouri 65101
Office (573) 635-0115
Fax (573) 635-0116

## FACSIMILE COVER SHEET

COMPANY: _Corizon_

ATTENTION: _Amira_

FAX NO.: _314-919-9283_

DATE: _8-19-14_                    (573)

FROM: _Michelle H (Capitol EyeCare) 659-5454_

NO. OF PAGES _8_
(Including cover sheet)

COMMENTS: _Amira As per your request for any_
_you fee schedule for services. If any_
_?S you can reach me @ the phone #_
_above. Thank you._

The information contained in this facsimile message is protected by the doctor/patient privilege and contains confidental information intended only for the use of the individual or above named. If the receiver of this message is not the intended recipient, or the employee or agent responsible for the intended recipient, you are hereby notified that any dissemination, distribution, or any communication is strictly prohibited. If you have received this communication in error, please notify us by phone immediately at 573-635-0115 and return the original message to us at the above address. Thank you.

# CONTRACT INFORMATION SHEET

| | | | |
|---|---|---|---|
| **Today's Date:** | 3/19/15 | **New Contract:** | |
| | | **Letter of Agreement:** | |
| **Effective Date:** | 2/12/15 | **Addendum / Amendment:** | X |
| | | **TERMINATION:** | |
| **Contractor:** | Amenah | **CHANGE:** | |
| | | **FEE SCHEDULE :** | |

**Contract Entity:** Central Missouri Medical Park Surgical Center

**To Pay:** CMMP Surgical Center, LLC

**Billing Address:** 1705 Christy Drive
Suite 100
Jefferson City, MO 65101

**Physical Address:** SAME

**Contact:** Angela Erosenko
**Telephone:** 573-659-5401
**Fax:** 573-659-5443
**Email:** aerosenko@symbion.com
**SS #:**
**Tax ID:** 43-1709558
**Medicare Prov #:**
**NPI # (indiv):**
**NPI # (group):**
**Service / Specialty:** Hospital

## Payment / Terms / Penalties:

**PROVIDER PAID BY - CLAIMS**

This addendum shall add reimbursement for CPT code C9290, Injectable Exparel. The injectable shall be reimbursed at provider's cost. Invoice for injectable must be submitted with claim.

**Facility / Site:** MO DOC

**Region / State:** MISSOURI

Timely filing limit:
Timely payment limit:
Late payment penalty:
MedicareGPCI:
Refund:
Offset:
CMS Language:
23-hour Observation Language:
Lesser of Billed Charges Language:

FOR PROVIDER OPERATIONS USE ONLY:

| | | |
|---|---|---|
| CIS Reviewed | AM | 3/20/15 |
| Fee Schedule Entered | | |
| FS Reviewed-Claims | | |
| Claims Adjusted | | |
| Fee Schedule Reviewed | | |

# ADDENDUM TO OUTPATIENT SURGICAL SERVICES AGREEMENT

## Between

## CORIZON, LLC.

## And

## CENTRAL MISSOURI MEDICAL PARK SURGICAL CENTER, LLC

**THIS ADDENDUM** (this "Addendum") is made and entered into this 12th day of February 2015, by and between Corizon, LLC. a Missouri corporation with principal offices located at 103 Powell Court, Suite 104, Brentwood, TN, 37027, acting for itself or on behalf of any/all/other affiliated companies (hereinafter collectively referred to as "Corizon Health") and Central Missouri Medical Park Surgical Center, LLC, (hereinafter collectively referred to as "Center") a Missouri based Center with principal offices located at 1705 Christy Drive, Suite 100, Jefferson City, MO 65101.

## RECITALS

**WHEREAS**, Corizon Health and Center have entered into an Agreement dated August 5, 1998, whereby the Center agrees to provide health care services to inmates and detainees under the control of the Missouri Department of Corrections ("Client"); and

**NOW THEREFORE**, in consideration of the mutual covenants and agreements contained herein, the parties agree as follows:

1. This addendum shall add reimbursement for CPT code C9290, Injectable Exparel. The injectable shall be reimbursed at provider's cost. Invoice for injectable must be submitted with claim.

2. Except as to the terms and conditions updated by this Addendum, all of the terms and conditions of the Agreement are declared by the parties to be in full force and effect.

*Remainder of page intentionally left blank*

1

**IN WITNESS WHEREOF**, the parties hereto have duly executed this Amendment as of the day and year first above written

**CORIZON, LLC.**

Ralf Salke

_(signature)_

Vice President, Operations

R. lf Solke    3-2-15

Print Name and Date

M. Therese Brumfield

_(signature)_

Vice President, Provider Operations

M. Therese Brumfield    3-13-15

Print Name and Date

**CENTRAL MISSOURI MEDICAL PARK SURGICAL CENTER, LLC**

_(signature)_

Signature

Angela Evosenko    02-17-2015

Print Name and Date

43-1709558

SS # or Tax ID #

1705 Christy Drive

Address

Suite 100

Address

Jefferson City MO 65101

Address

573 635 7022

Telephone Number

2

# Contract Distribution Check List

Please distribute this contract to the departments/individuals checked below when Fully Executed

Provider: ___CMMP_____  hsp [ x ] anc [  ] phy [  ]

Contractor: _Amenah Martin_____  IC [  ] Sub [  ]

| Claims Dept: | Payable by Claims | [ X ] | | |
|---|---|---|---|---|
| **Position** | **Contact** | | *Admin Initials* | |
| Director | Paula G. | [  ] | [  ] | |
| Manager | Drew F. | [  ] | | |
| Configuration | April | [  ] | | |
| | Nanette | [  ] | | |
| | Karyn | [  ] | | |

| Accounts Payable | Payable by AP | [  ] | | |
|---|---|---|---|---|
| Manager | Alva W. | [  ] | [  ] | |
| Supervisor | Melissa D. | [  ] | | |

| Accounting | | | | | |
|---|---|---|---|---|---|
| Director, Ops Accounting | Ashley R. | [ X ] | [  ] | | |
| | Jennifer B. | [ x ] | | Rebates | [  ] |
| | Julia S. | [ x ] | | Fixed Rates | [  ] |
| Director, Corp Accounting | Ashley B. | [ x ] | | Hospital | |
| Corp Accountant | Anita D. | [ x ] | | | |
| Corp Accountant | Erica G. | [ x ] | | | |

| Utilization Management | | | | | |
|---|---|---|---|---|---|
| Directors, UM | Feli L. | [ x ] | [  ] | | |
| | Mignon (Lori) E. | [ x ] | | Hospital | [ x ] |
| | Sharon F | [ x ] | | | |
| Vice President, UM | Pablo V. | [ x ] | | | |

| Provider Operations | | | | |
|---|---|---|---|---|
| Director, Provider Rel | DeeDee | [ x ] | [  ] | |
| Contract Specialist | Amenah | [ x ] | | |
| | Robin | [  ] | | |
| | LaTonya | [  ] | | |
| | Paolo | [  ] | | |
| | Carla | [  ] | | |
| | Terry | [  ] | | |

| Field Operations | | | | |
|---|---|---|---|---|
| Vice President Operations | Ralf Salke | [ X ] | [  ] | |
| | *contractor write-in* | | | |
| Regional Admin Assistant | Robyn Brown | [ X ] | [  ] | |
| | *contractor write-in* | | | |
| Health Service Admin (HSA) | _____ | [  ] | [  ] | |
| | *contractor write-in* | | | |

Dist. Completion Date: _____

# FOURTH AMENDMENT TO THE
## OUTPATIENT SURGICAL SERVICES AGREEMENT
### BETWEEN
## CORRECTIONAL MEDICAL SERVICES, INC.
### AND
## CENTRAL MISSOURI MEDICAL PARK SURGICAL CENTER, LLC

**THIS FOURTH AMENDMENT** ("Amendment") is made and entered into this 1st day of December, 2009, by and between **CORRECTIONAL MEDICAL SERVICES, INC.** ("CMS"), a Missouri corporation, and **CENTRAL MISSOURI MEDICAL PARK SURGICAL CENTER, LLC,** a Missouri based limited liability corporation ("Center").

## RECITALS

**WHEREAS,** CMS and Center entered into an Agreement dated August 5, 1998, whereby the Center agrees to provide health care services to inmates of the Missouri Department of Corrections ("Client"); and

**WHEREAS,** CMS and Center agree to amend the Outpatient Surgical Services Provider Agreement.

**NOW THEREFORE,** in consideration of the mutual covenants and agreements contained herein, the parties agree as follows:

1. Exhibit B.1 is hereby deleted in its entirety and replaced with the attached Exhibit B.1.

2. Except as to the terms and conditions updated by this Amendment, all of the terms and conditions of the Agreement are declared by the parties to be in full force and effect.

**IN WITNESS WHEREOF,** the parties hereto have caused this Amendment to be executed by their duly authorized officers.

**CORRECTIONAL MEDICAL SERVICES, INC.**

Name _____  MKP

Vickie Bybee
**Print Name**

Chief Operating Officer
**Title**

12-10-09
**Date**

**CENTRAL MISSOURI MEDICAL PARK SURGICAL CENTER, LLC.**

Name _____

Angela Erosenko
**Print Name**

Administrator
**Title**

12-01-09
**Date**

431709558
**Tax Identification Number**

# *CONTRACT INFORMATION SHEET*

| | | |
|---|---|---|
| **Today's Date:** | 2/13/12 | **New Contract:** _____ |
| | | **Letter of Agreement:** _____ |
| **Effective Date:** | 1/30/12 | **Addendum / Amendment:** **X** |
| | | **TERMINATION:** _____ |
| **Contractor:** Lisa Rossics | | **CHANGE:** _____ |
| | | **FEE SCHEDULE :** _____ |

**Contract Entity:** Central Missouri Medical Park Surgical Center, LLC

**To Pay:** Central Misouri Medical Park Surgical Center, LLC

**Billing** 1705 Christy Drive, Ste 100
**Address:** Jefferson City, MO 65101

**Physical** 1705 Christy Drive, Ste 100
**Address:** Jefferson City, MO 65101

**Contact:** Angela Erosenko, Facility Administrator
**Telephone:** 573-635-7022
**Fax:** 573-659-5443
**Email:** aerosenko@symbion.com
**Tax ID:** 43-17019558
**Medicare Prov #:** _____
**NPI #** (indiv): _____
**NPI #** (group): _____
**Service / Specialty:** general surgery

**Payment /** **PROVIDER PAID BY -** claims
**Terms /** clarifying multiple surgery payment methods and updating rates by 3% (approx. $20K annually)
**Penalties:**

**Facility / Site:** Shakopee

**Region / State:** Minnesota

| | | | |
|---|---|---|---|
| **Requested by:** | Ralf Salke, VPO | **Submitted to SW/TB for Signature:** | 2/13/2012 |
| **Date Submitted to Provider:** | 1/30/2012 | **Received Signed:** | _____ |
| **Date Received:** | 2/9/2012 | **Submitted to Sr. Exec for Signature (if needed):** | _____ |
| **Submitted to VPO for Approval:** | 2/13/2012 | **Received Signed:** | _____ |
| **Approval Received from VPO:** | 2/15/2012 | **Date Routed:** | _____ |

**Timely filing limit:** _____
**Timely payment limit:** _____
**Late payment penalty:** _____
**MedicareGPCI:** _____
**Refund:** _____
**Offset:** _____
**CMS Language:** _____
**23-hour Observation Language:** _____
**Lesser of Billed Charges Language:** _____

FOR PROVIDER OPERATIONS USE ONLY:

| | | |
|---|---|---|
| CIS Reviewed | | |
| Fee Schedule Entered | | |
| FS Reviewed-Claims | | |
| Claims Adjusted | | |
| Fee Schedule Reviewed | | |

# FIFTH AMENDMENT TO OUTPATIENT SURGICAL SERVICES AGREEMENT
## BETWEEN
## CORIZON, INC.
### AND
## CENTRAL MISSOURI MEDICAL PARK SURGICAL CENTER, LLC

**THIS FIFTH AMENDMENT** (this "Amendment") is made and entered into this 30th day of January, 2012, by and between **CORIZON, INC.** and its affiliated entities, a Missouri corporation (collectively, "Corizon"), with principal offices located at 105 Westpark Drive, Suite 200, Brentwood, Tennessee 37027, and **CENTRAL MISSOURI MEDICAL PARTK SURGICAL CENTER, LLC**, a Missouri based limited liability corporation ("Center") with principal offices located at 1705 Christy Drive, Suite 100, Jefferson City, Missouri 65101.

## RECITALS

**WHEREAS**, Corizon and Center have entered into an Agreement dated August 5, 1998, whereby the Center agrees to provide health care services to inmates of the Missouri Department of Corrections; and

**WHEREAS**, Corizon and Center agree to amend the Outpatient Surgical Services Agreement.

**NOW THEREFORE**, in consideration of the mutual covenants and agreements contained herein, the parties agree as follows:

1. Correctional Medical Services, Inc. ("CMS") shall hereby be changed to Corizon, Inc. and its affiliated entities ("Corizon") in the original Agreement and all subsequent Amendments.

2. Exhibit B.1 will be deleted in its entirety and replaced with the attached.

3. Except as to the terms and conditions updated by this Amendment, all of the terms and conditions of the Agreement are declared by the parties to be in full force and effect.

**[THE REMAINDER OF THIS PAGE WAS INTENTIONALLY LEFT BLANK.]**

**IN WITNESS WHEREOF**, the parties hereto have caused this Amendment to be executed by their duly authorized officers.

CORIZON, INC.

_____
SIGNATURE

Scot Ward_____
PRINT NAME

VP, Business Support & Analysis
TITLE

_2/16/2012_____
DATE

CENTRAL MISSOURI MEDICAL PARK
SURGICAL CENTER, LLC

_____
SIGNATURE

Angela Erosenko_____
PRINT NAME

Facility Administrator
TITLE

February 6, 2012
DATE

**43-170 9558**
TAX IDENTIFICATION NUMBER

# OUTPATIENT SURGICAL SERVICES PROVIDER AGREEMENT
## BETWEEN
## CORRECTIONAL MEDICAL SERVICES, INC.
### AND
## CENTRAL MISSOURI MEDICAL PARK SURGICAL CENTER LLC.

THIS AGREEMENT, made and entered into as of the **5th day of August, 1998 (the "Effective Date"),** by and between CORRECTIONAL MEDICAL SERVICES, INC., a Missouri corporation (hereinafter called "CMS") and Central Missouri Medical Park Surgical Center LLC., a licensed and accredited Outpatient Surgery Center (hereinafter called "Center").

WITNESSETH:

WHEREAS, CMS seeks to provide health care services to certain correctional facility patients pursuant to agreements between CMS and its Client; and

WHEREAS, Center is a licensed Outpatient Surgery facility in the State of Missouri; and

WHEREAS, Center desires to provide outpatient surgical services to the correctional facility patients and detainees eligible for such services. CMS desires to engage Center to provide outpatient surgical services to such correctional facility patients, all on the terms and conditions set forth herein;

NOW THEREFORE, for and in consideration of the mutual covenants, promises, and payments as are hereinafter set forth, and other good and sufficient consideration, the sufficiency of which is hereby acknowledged by the parties, CMS and Center hereby agree as follows:

1  <u>DEFINITIONS</u>

Capitalized terms used herein shall have the meanings ascribed thereto in the Definitions List, attached hereto as **Exhibit A**, or as otherwise parenthetically identified throughout this Agreement.

2  <u>CENTER'S RIGHTS AND OBLIGATIONS</u>

1

2.1 <u>General Engagement</u>. CMS hereby engages Center to provide Covered Services to Patients who are under the custody and control of the Client, and Center hereby accepts such engagement according to the terms and conditions of this Agreement.

2.2 <u>Time and Place of Services</u>. Center agrees to provide and/or make available Covered Services at Center's usual and customary site for rendering Health Care Services, and in accordance with Center's usual and customary schedule for rendering Health Care Services.

2.3 <u>Qualifications</u>. Center represents that Center possesses a current and unrestricted license to operate as a Center in the State of Missouri. Center also represents that Center possesses current and unrestricted controlled substance certification. Center agrees to fulfill at all times all applicable requirements of federal, state, and local law and other regulatory and certification requirements which govern Center's operations. Center further agrees to immediately notify CMS if Center receives notice of noncompliance with such requirements, conditions, and standards, and if Center's status is changed in any respect.

2.4 <u>Program Compliance</u>. Center specifically agrees to observe, comply with, and participate in CMS's Quality Programs, and utilization review and management programs as stated below:

2.4.1 <u>Utilization Review and Triage</u>. CMS will refer Patients to the Center for Health Care Services hereunder only after a determination by CMS' medical staff that the Patient requires off-site services. Center will cooperate with CMS in the implementation of its utilization review program. Center will notify CMS's Utilization Management Department prior to any invasive procedure or surgery and will obtain certification and authorization. Center will cooperate with CMS Utilization Management Department to authorize Patients. In the event surgery is deemed urgent and the Center is unable to contact the CMS Utilization Management Department, the Center shall receive temporary certification and authorization for the surgery. The CMS Utilization Management Department shall be contacted on the first working day after the occurrence. The Center will assist with physician communications regarding each case. Center will provide CMS with access to Patient information useful in ascertaining the medical necessity of particular procedures. Center will make available for review by CMS Utilization Management Department and/or the all records maintained by the Center regarding Patients, subject to applicable law regarding confidentiality of such records, the cost of any copies of which will be borne by requesting party. Center and

2.

CMS will ensure that medical records maintained on Patients remain confidential and are not disclosed to any persons except as permitted by applicable law. CMS agrees to obtain a release of information from each Patient in order that the medical record may be reviewed by CMS. Center Medical Records Department will honor CMS Utilization Management Department's request for records upon authorization

      2.4.2 <u>Quality Assurance</u>. Center shall make available for review and examination by CMS' Medical Director or his designee, at CMS' request, the proceeding of any Center quality assurance committee and function as they reasonably relate to services rendered to patients hereunder.

      2.5 <u>Purchased Services</u>. Center will provide only those services currently offered at Center to Patients according to Exhibit B. If Center decides to voluntarily add, limit, or discontinue any of the Health Care Services that it offers, it will provide CMS with written notice of such action at least sixty (60) days prior to such addition, limitation, or discontinuation. If Center must involuntarily limit or discontinue any services, it will provide CMS with written notice as soon as possible upon learning of such limitation or discontinuation.

      2.5.1 <u>Services Not Provided by Center.</u> Center will notify CMS of a Patient's need for service not provided (currently or otherwise) by Center. Center will not purchase and is not responsible for obtaining needed Health Care Services for Patients which are not routinely provided at Center. CMS shall be responsible for obtaining such health care and to arrange transportation for treatment elsewhere. CMS assumes all responsibility for the cost associated with the needed health service and for the provision of such health care.

      2.6 <u>Compliance with Applicable Law</u>. Center agrees that all Covered Services provided by or through Center pursuant to this Agreement, and documentation thereof, will be in compliance with applicable law and certification or licensure requirements.

      2.7 <u>Security</u>. Center shall cooperate with all necessary security arrangements whether provided by the Client or such other duly qualified security or law enforcement agency, to the satisfaction of the CMS Medical Director and/or the Client.

3      <u>COMPENSATION OF CENTER</u>

3

3.1　　Compensation for Services.　Center will be compensated for Covered Services rendered as is set forth in the Compensation Schedule, attached hereto as Exhibit B. Notwithstanding the foregoing, Center acknowledges and agrees that Center's compensation hereunder shall be subject to any caps on hospitalization, catastrophic care and any other applicable cap out outlined in CMS's agreement with the                                                                                               Client.

3.1.1 All hospital claims contractually paid at a percentage of covered charges are reviewed by a nurse analyst. In this process, the nurse reviews detailed charges for improper billing including unbundling. The review process also includes a verification of diagnosis code in relation to the performed procedures. All itemized services are analyzed for payment on an individual basis according to the type and location of service being provided.

3.2　　Claims Submission.　To be eligible for compensation under this Agreement, Center must submit a Completed Claim for each episode of Covered Services provided to a Patient. A Completed Claim must be submitted within one hundred twenty (120) days of the service rendered, or ninety (90) days following termination of this Agreement. Payment of claims submitted after ninety (90) days following termination of the agreement shall be permanently denied.

3.3　　Dispute Resolution.　In the event that a dispute arises between CMS and Center concerning compensation or any other matter under this Agreement, Center must submit the dispute in writing to CMS within thirty (30) calendar days following receipt of CMS's response to claim. CMS shall provide a reply and shall initiate appropriate action, if any, within sixty (60) days following receipt of Center's notice of dispute.

3.4　　Patient Verification.　Except for Emergency Services, CMS shall not be responsible for payment for Covered Services or Health Care Services unless the Patient has been referred for care by the CMS Medical Director or his/her designee or upon written verification of authorization for Covered Services upon presentation to Center in accordance with Section 2.4.1. Center will not provide Health Care Services to any Patient without written verification of authorization for Covered Services upon presentation to Center in accordance with Section 2.4.1. Center agrees that the CMS Medical Director or his designee will make the final determination whether a Patient requires Health Care Services in excess of Center's scope of service, staffing, equipment, recommendation or capability. CMS agrees to accept responsibility for the provision of Health Care Services in excess of Center's scope of services, staffing

4

equipment, recommendation or capability contingent upon Center meeting the notice requirement of Section 2.4.1.

3.5    Right of Recovery. CMS assumes responsibility for payment for services rendered secondary to primary sources of insurance or health & welfare benefits. Center will identify and seek payment from all other primary sources prior to seeking payment from CMS. Center will not seek reimbursement from the inmate patient nor from the State, County or City agency or political subdivision responsible for inmate patient health care unless the inmate patient or State, County or City agency is responsible for the payment.

4    TERM AND TERMINATION

4.1    Term.  The term of this Agreement will commence on the Effective Date and will continue in effect for one (1) year and shall be automatically renewed for recurring one (1) year terms thereafter, subject to termination of the Agreement as provided herein.

4.2    Termination.

4.2.1    Termination As Of Right.  At any time during the term of this Agreement, either party hereto may notify the other party of its intent to terminate this Agreement, with or without cause, by providing notice to the other party in writing by certified mail, return receipt requested.  Such termination will be effective ninety (90) days after the receipt of such notice by the non-terminating party.

4.2.2    Non-Renewal.  This Agreement may be terminated by notification from either party to the other party that the terminating party desires not to renew the Agreement within sixty (60) days before the expiration thereof.  Such notice of non-renewal must be communicated to the non-renewing party in writing by certified mail, return receipt requested.

4.2.3    Termination For Cause.  Either party may terminate this Agreement upon the occurrence of any of the following events, which has not been cured within thirty (30) days after written notice from either party or, for events which in the judgment of non breaching party cannot be cured within thirty (30) days, no good faith attempt to effect a cure has been made.

4.2.3.1    A party has breached any of the material terms and conditions of this Agreement or the exhibits or attachments hereto.

5

4.2.3.2 Any activities or actions of a party that, in the judgment of the other party, are deemed to be substantially detrimental to that party.

4.2.4 <u>Immediate Termination</u>. CMS may immediately terminate this Agreement upon the occurrence of any of the following events:

4.2.4.1 The failure of Center (or any employee, agent or independent contractor utilized by Center) to meet any of the qualification requirements specified in this Agreement or any misrepresentation by Center of Center's qualifications; or

4.2.4.2 Center's failure to maintain required insurance as provided in this Agreement;

4.2.4.3 Center's inability to meet its obligations pursuant to this Agreement due to financial insolvency, bankruptcy, or lack of capacity to provide Health Care Services; or

4.2.4.4 Any act or omission of Center or any employee, agent or independent contractor utilized by Center which CMS determines in good faith to be materially injurious or detrimental to CMS, provided however that the act or omission of any employee, agent or independent contractor provider shall not be grounds for termination of this Agreement if Center ceases to utilize such individual to provide services hereunder.

4.2.5 <u>Immediate Termination.</u> Center may immediately terminate this Agreement upon the occurrence of any of the following events:

4.2.5.1 In the event CMS becomes ninety (90) days or more delinquent in payment of its account hereunder to Center unless it is a disputed amount in accordance with Section 3.3.

5    <u>INSURANCE AND INDEMNIFICATION</u>

5.1    <u>Center's Insurance</u>.  At all times during the term of this Agreement and any renewals hereof, Center shall maintain policies of insurance or self-insurance providing coverage for Centers general liability and professional liability as Center determines may be necessary to protect Center and its employees, agents or representatives in the discharge of its or their duties under this Agreement.  Without limiting the obligations of Center under this Section, the insurance maintained or

6

caused to be maintained pursuant to this Section will provide coverage against civil actions based on medical treatment brought under 42 U.S.C. § 1983, and as that statute may be amended, modified, recodified, or succeeded in the future. The obligations of this Section concerning Continuing Coverage shall survive termination of this Agreement.

5.2 <u>CMS's Insurance</u>. At all times during the term of this Agreement and any renewals hereof, CMS shall maintain policies of insurance or self-insurance providing coverage for CMS's general liability and professional liability as CMS determines may be necessary to protect CMS or its employees, agents, or representatives in the discharge of its or their duties under this Agreement.

5.3 <u>Certificates</u>. Center shall, within ten (10) days after execution of this Agreement and on an annual basis thereafter, provide to CMS certificates issued by an insurance carrier or its agent or other evidence of insurance as required under this Agreement. Center shall provide CMS with at least thirty (30) days prior written notice of any modification, cancellation, or non-renewal of such policies.

5.4 <u>Indemnification</u>. Center shall indemnify and hold harmless CMS from and against claims against CMS which are based upon the acts and/or omissions of Center and/or any of Center's employees, agents, officers, or contractors, or which are caused by Center's facilities, premises or equipment in connection with this Agreement.

5.5 <u>Survival</u>. This Section 5 <u>Insurance and Indemnification</u> shall survive termination of this Agreement for any reason.

# 6    RELATIONSHIP OF THE PARTIES

6.1    <u>Relationship of the Parties</u>.  The relationship of Center to CMS is that of independent contractor.  Nothing contained herein shall create an employer-employee, principal-agent, or partnership relationship between CMS and Center or between CMS and any employee, agent, or Physicians of Center.  CMS shall not exercise control or direction over the manner in which Center or any employee, agent, or Physicians of Center renders services except as provided in 2.4 and 3.4.  Nothing contained herein shall interfere with the Center-patient relationship between Center and any patient, including Patients, nor with Center's legal or ethical obligation to provide the proper standard of care to patients.

6.2    <u>Non-Compete</u>.    Center acknowledges that CMS has expended considerable time, effort, and resources in developing its product to serve the Client and to enable Center to provide Covered Services to the Patients; accordingly, Center agrees that for a period of one (1) year following the termination of this Agreement for any reason, Center shall not seek or accept employment by, offer, or provide Health Care Services, directly or indirectly, as an agent, independent contractor, independent provider or otherwise, to the Client or for the Patients, without the prior written consent of CMS.  Center represents and warrants that the enforcement of the provisions of this Section, by way of specific injunction for Patients from the Correctional Facility, will not prevent Center from conducting its usual and customary operations, and the provisions of this Section are necessary to protect the interests of CMS.

6.3    <u>Non-Disclosure</u>.  Center agrees not to disclose any proprietary business information including, without limitation, the terms of this Agreement or any information pertaining to the proprietary business information of CMS, to any other party except as may be specifically provided otherwise in this Agreement.  CMS and Center will treat all information furnished by any other parties as confidential and proprietary business information.  This Section shall survive termination of this Agreement.

6.4    <u>Liability</u>.  Each party hereto shall be liable for its own acts and omissions and the acts and omissions of its employees and agents, and nothing hereunder shall impute or transfer liability to CMS or to Center.

6.5    <u>Non-Exclusivity</u>.  This Agreement is a non-exclusive arrangement.  Center may participate in other affiliations and render such other Health Care Services as Center determines.  Center acknowledges that CMS must contract with other health

Case 2:22-cv-04191-MDH   Document 16-1   Filed 01/06/23   Page 36 of 60

care providers for the purpose of fulfilling its obligations pursuant to Agreement with the "Client".

6.6 <u>Medical Records</u>. CMS shall make available to Center all current medical records of each patient to be treated at Center's outpatient surgery center no later than one (1) day prior to the patient's scheduled treatment or procedure.

7 <u>CONSTRUCTION OF AGREEMENT</u>

7.1 <u>Assignment</u>. Center's rights and duties under this Agreement, whether in whole or in part, may not be assigned, delegated, or transferred without the prior written consent of CMS.

7.2 <u>Amendments</u>. This Agreement may be amended only by written agreement between the parties. The parties acknowledge that amendments to this Agreement may be required from time to time to comply with state, federal, or local law.

7.3 <u>Section Headings</u>. The headings of sections in this Agreement are for reference only and shall not effect the meaning of this Agreement.

7.4 <u>Entire Agreement</u>. This Agreement, with the attached Exhibits A and B, which are all incorporated herein by this reference, constitutes the entire contract between the parties. No other prior or contemporaneous promise, obligation, statement or understanding between the parties, whether written or oral, shall be valid or binding. The parties may execute this Agreement in any number of counterparts, and each counterpart will, for all purposes, be deemed to be an original instrument, but all such counterparts together will constitute the same Agreement. At the request of any party, the parties will confirm facsimile transmitted signatures by signing an original agreement.

7.5 <u>Binding Effect</u>. This Agreement shall be binding upon and inure to the benefit of each party hereto, and their successors and permitted assigns. No party may assign this Agreement, except upon written consent of the other party.

7.6 <u>No Third Party Beneficiary Rights</u>. No patient, nor the Client, nor any other non-party shall have any third party beneficiary right hereunder.

9

7.7    Severability.  Should any provision (or part thereof) of this Agreement be held to be invalid and/or unenforceable, the remaining provisions shall remain in full force.

7.8    Notices.    Any notice required hereunder (including notice of an amendment of this Agreement) shall be sent by registered or certified mail (return receipt requested), personal delivery, overnight commercial carrier, or other guaranteed delivery.  The notice shall be effective as of the date of delivery if the notice is personally delivered, or the date of posting if the notice is forwarded by other means.  Unless otherwise specified, notices shall be sent to:

> "CMS"
> Correctional Medical Services, Inc.
> 12647 Olive Boulevard
> St. Louis, Missouri  63141
> ATTN:   Director of Business Operations and Contracting

> Central Missouri Medical Park Surgical Center, LLC.
> 1705 Christy Dr.
> Jefferson City, MO 65101

7.9    Non-Discrimination.   No party hereto shall discriminate on the basis of race, color, sex, religion, national origin, ethnic group, age, state of health, need for health services, place of residence, or disability.

8. Dispute Resolution

8.1 Dispute Resolution.  In the event that a dispute between CMS and Hospital arises out of or is related to this Agreement and concerns compensation or any other matter under this Agreement, the parties to the dispute shall meet and negotiate in good faith to attempt to resolve the dispute.  If after 30 days following the date one party sent written notice of the dispute to the other party, the dispute is not resolved, and if one party wishes to pursue the dispute, it shall be submitted to binding arbitration in accordance with the rules of the American Arbitration Association.  In no event may arbitration be initiated more than one year following the sending of written notice of the dispute. Any arbitration proceeding under this Agreement shall be conducted in St. Louis County, Missouri.   The arbitrators may construe or

10

interpret but shall not vary or ignore the terms of this Agreement, shall have no authority to award any punitive or exemplary damages, and shall be bound by controlling law. If the dispute pertains to a matter which is generally administered by certain CMS procedures, such as medical and utilization management or quality assessment plan, the procedures set forth in that plan must be fully exhausted by Hospital before Hospital may invoke its right to arbitration under this section. The parties further acknowledge that this Agreement involves interstate commerce and that the Federal Arbitration Act applies.

THIS AGREEMENT CONTAINS A BINDING ARBITRATION PROVISION.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the Effective Date.

CENTRAL MISSOUR MEDICAL PARK
SURGICAL CENTER, LLC.

By: _____

Its: _____Executive Director_____

Date: _____8-27-98_____

Fed. Tax ID #: __43-1709558_____

CORRECTIONAL MEDICAL
SERVICES, INC.

By: _____

Its: _____Regional Manager_____

Date: _____8-27-98_____

11

# EXHIBIT A

## Definitions List

**CMS Medical Director** means the independently contracted or employed physician selected and identified by CMS to act as the CMS Medical Director for each correctional facility or other site served by CMS.

**Client** means party such as a local Sheriff's Department or State Department of Corrections, who has contracted with CMS to manage the healthcare of their patients.

**Completed Claim** means a timely claim for reimbursement of Covered Services which contains at least the following items of information: (1) Patient Name and Identification number; (2) Patient Date of Birth; (3) Date(s) of Service; (4) Center's Name and Tax identification Number; (5) ICD-9 Diagnostic Code(s) and Description(s); (6) CPT-4 procedure Code(s) and Description(s); and, (7) Detailed Billing of Charges.

**Covered Services** means those Health Care Services which are Medically Necessary and are authorized and approved by the CMS Medical Director.

**Emergency Medical Condition** means a medical condition manifesting itself by acute symptoms of sufficient severity such that the absence of the immediate medical attention could reasonably be expected to result in placing the health of a Patient in serious jeopardy, serious impairment to bodily functions, or serious dysfunction of any bodily organ or part or such other urgent condition that constitutes an Emergency Medical Condition under Agreement with the "Client".

**Emergency Services** means those Health Care Services which are Medically necessary and provided for the treatment of an Emergency Medical Condition.

**Health Care Services** means the Center, medical, and related services and/or supplies provided by Center or any health care professional to the general public.

**Medically Necessary** describes those services which are determined to be: appropriate for the treatment of a patient's medical condition; provided for the diagnosis or care and treatment of a patient's medical condition; in accordance with the applicable standards of good medical practice; not primarily for the convenience of the patient or the medical provider; and, the most appropriate and available supplier level of service that can be safely provided to the patient.

12

Patients means those correctional facility patients or detainees for whom CMS is obligated to provide Health Care Services pursuant to Agreement with the "Client".

# FIRST AMENDMENT TO THE
## OUTPATIENT SURGICAL SERVICES PROVIDER AGREEMENT
## BETWEEN
## CORRECTIONAL MEDICAL SERVICES, INC.
## AND
## CENTRAL MISSOURI MEDICAL PARK SURGICAL CENTER, LLC.

THIS FIRST AMENDMENT, effective July 1, 2000, is made by and between CORRECTIONAL MEDICAL SERVICES, INC., 12647 Olive Boulevard, St. Louis, Missouri 63141 and CENTRAL MISSOURI MEDICAL PARK SURGICAL CENTER, LLC (Center), 1705 Christy Dr., Jefferson City, Missouri 65101 for the purpose of amending the terms and conditions of the Agreement ("Agreement") among the parties effective August 5, 1998.

The parties agree to delete EXHIBIT B in its entirety and replace with EXHIBIT B.1 as follows:

## EXHIBIT B.1

## CENTER COMPENSATION SCHEDULE

### I. Definitions

**Admission:**   The admittance of a Patient to a licensed Center bed for a period of not more than 23 hours.

**Health Services:**   The health care services and supplies covered by a Patient's health benefit plan as administered by CMS.

**Observation:**   Appropriately authorized Health Services rendered to a Patient on an outpatient basis which are necessary to evaluate and oversee the Patient's condition.   Health Services related to Observation include, but are not limited to, the use of a bed and periodic monitoring by a health care professional.   Observation Health Services rendered on an outpatient basis are to determine the need for possible Admission of the Inmate or to determine the timing for discharging the Patient from the Center.

**Outpatient Surgical or Scopic Procedure:**   The Health Services rendered by Center to a Patient which involve a surgical or scopic procedure performed in an ambulatory surgical or outpatient unit of Center.   Health Services related to an Outpatient Surgical or Scopic Procedure shall include, but not be limited to, professional fees billed by the Center or its agents, employees or independent contractors, pre-admission testing, nursing care, diagnostic and therapeutic services, ancillary services, durable medical equipment, supplies (including, but not limited to, anesthesia supplies), medications and facility costs.

**Payment Rate:**   The percentage payment made to Center for Health Services rendered to an Inmate, which is calculated as a percentage of Customary Charges for Health Services.

**Per Case Payment:**   The payment made to Center for Health Services rendered to a Patient during an Admission, for Observation, or for an Outpatient Surgical or Scopic Procedure. Such payment shall be considered payment in full for all Health Services rendered to the Patient before, during and after the Admission, Observation or Outpatient Surgical or Scopic Procedure including, but not limited to, professional fees billed by the Hospital, pre-admission testing, nursing care, critical care, diagnostic and therapeutic services, ancillary services, durable medical equipment, supplies, medications, ambulance services, and room and board charges, unless otherwise provided for in this Agreement.

**SECTION 2**
**Payment for Health Services**

**2.1   Payment.**   For Health Services rendered to a Patient, Center shall be paid by CMS the amounts set forth in this Exhibit.

**2.2   Observation and Outpatient Health Services.**

1.   **Observation and Outpatient Therapeutic, Diagnostic, Emergency, Urgent Care Health Services.**   For the provision of Observation Health Services and therapeutic, diagnostic, emergency, and urgent care Health Services rendered by Center to a Patient on an outpatient basis, Center shall be paid by CMS pursuant to the table below.

2.   **Outpatient Surgical or Scopic Procedures.**   CMS shall pay Center for Outpatient Surgical or Scopic Procedures a payment of <u>$1250.00</u> per case. Such payment shall be considered payment in full for all Health Services rendered to Patient during an Outpatient Surgical or Scopic Procedure. Identification of surgical and scopic procedures by CPT-4 code is required for payment.

3.   **Multiple Outpatient Surgical or Scopic Procedures.**   Multiple Outpatient Surgical or Scopic Procedures performed on a Patient by Center during one occasion of surgery shall be paid:   (1) the highest payment ($1250.00) specified in section 2.2.2 for which an Outpatient Surgical or Scopic Procedure has been performed; (2) 50% of the next highest payment (~~$556.00~~) specified in section 2.2.2 for the second Outpatient Surgical or Scopic Procedure performed; and (3) 50% of the next highest payment (~~$278.00~~) specified in section 2.2.2 for the third Outpatient Surgical or Scopic Procedure performed.   No additional payments for additional Outpatient Surgical or Scopic Procedures performed shall be made.

*[handwritten annotations in margins: "RS", "OB", "$625.00", "RJ", "OB", "$312.50"]*

4. **Implantable devices associated with outpatient surgery procedures.** Center shall be paid by CMS the invoice cost plus 15% of the implantable devices used by Center in addition to the case rate upon CMS receipt of a valid invoice.

## SECTION 3
### Miscellaneous Provisions

**3.1    All-Inclusive Rates.**  All rates are all-inclusive unless specified otherwise in this Exhibit.

Except as to the terms and conditions added and amended by this Amendment, all of the terms and conditions of the Agreement are declared by the parties to be in full force and effect.

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be executed by their duly authorized officers.

| CENTRAL MISSOURI MEDICAL PARK SURGICAL CENTER, LLC. | CORRECTIONAL MEDICAL SERVICES, INC. |
|---|---|
| By: _____ | By: _____ |
| Its/Title: _____C O O_____ | Its/Title: _Regional Manager_ |
| Date: _6-22-00_ | Date: _6-26-00_ |

3

# SECOND AMENDMENT TO THE OUTPATIENT SURGICAL SERVICES PROVIDER AGREEMENT BETWEEN CORRECTIONAL MEDICAL SERVICES, INC. AND CENTRAL MISSOURI MEDICAL PARK SURGICAL CENTER, LLC.

THIS SECOND AMENDMENT, effective February 1, 2004, is made by and between CORRECTIONAL MEDICAL SERVICES, INC. ("CMS"), 12647 Olive Boulevard, St. Louis, Missouri 63141 and CENTRAL MISSOURI MEDICAL PARK SURGICAL CENTER, LLC ("Center"), 1705 Christy Dr., Jefferson City, Missouri 65101 for the purpose of amending the terms and conditions of the Agreement ("Agreement") among the parties effective August 5, 1998 and the First Amendment to the Agreement ("First Amendment") effective July 1, 2000.

The parties agree to amend EXHIBIT B.1 of the First Amendment, which replaced EXHIBIT B of the Agreement by adding an additional paragraph to SECTION 2, designated as paragraph 2.2.5 and reading as follows:

### 2.2    *Observation and Outpatient Health Services.*

> **5.    *Colonoscopies and EGD's.*** *Notwithstanding any other provision to the contrary, CMS shall pay Center for Colonoscopies (CPT-4 codes 45378-45386, G0105 and G0121) and Esophagogastroduodenoscopies ("EGD's") (CPT-4 codes 43234-43239) a payment of Four Hundred Dollars ($400) per case. Such payment shall be considered payment in full for all Health Services rendered to Patient during such procedure. Identification of such procedures by CPT-4 code shall be required for payment.*

Except as to the terms and conditions added and amended by this Second Amendment, all of the terms and conditions of the Agreement, as amended by the First Amendment are declared by the parties to be in full force and effect.

IN WITNESS WHEREOF, the parties hereto have caused this SECOND AMENDMENT to be executed by their duly authorized officers.

| **CENTRAL MISSOURI MEDICAL PARK SURGICAL CENTER, LLC.** | **CORRECTIONAL MEDICAL SERVICES, INC.** |
|---|---|
| By: _____ | By: _____ |
| Its/Title: Administrator | Its/Title: Executive Vice President |
| Date: 03-25-04 | Date: April 6, 2004 |

# THIRD AMENDMENT TO THE
## OUTPATIENT SURGICAL SERVICES AGREEMENT
### BETWEEN
## CORRECTIONAL MEDICAL SERVICES, INC.
### AND
## CENTRAL MISSOURI MEDICAL PARK SURGICAL CENTER, LLC

**THIS THIRD AMENDMENT** ("Amendment") is made and entered into this 1st day of March, 2007, by and between **CORRECTIONAL MEDICAL SERVICES, INC.** ("CMS"), a Missouri corporation, and **CENTRAL MISSOURI MEDICAL PARK SURGICAL CENTER, LLC,** a Missouri based limited liability corporation ("Provider").

## RECITALS

**WHEREAS**, CMS and Provider entered into an Agreement dated August 5, 1998, whereby the Provider agrees to provide health care services to inmates of the Missouri Department of Corrections ("Client"); and

**WHEREAS**, CMS and Provider agree to amend the Outpatient Surgical Services Agreement.

**NOW THEREFORE**, in consideration of the mutual covenants and agreements contained herein, the parties agree as follows:

1.      Section 2.2.2 of Exhibit B.1 will be deleted in its entirety and replaced with the following:

> **2.      Outpatient Surgical or Laparoscopic Procedures.** CMS shall pay Center a payment of one thousand three hundred dollars ($1,300) per case. Such payment shall be considered payment in full for all Health Care Services rendered to Patient during an outpatient surgical or laparoscopic procedure. Identification of surgical and laparoscopic procedures by CPT-4 code is required for payment.

2.      Section 2.2.3 of Exhibit B.1 will be deleted in its entirety and replaced with the following:

> **3.      Multiple Outpatient Surgical or Laparoscopic Procedures.** Multiple outpatient surgical or laparoscopic Procedures performed on Patient at Center during one occasion of surgery shall be paid in accordance with Medicare guidelines, as follows: (1) one thousand three hundred dollars ($1,300) for the principal procedure; (2) six hundred fifty dollars ($650) for the secondary procedure; and (3) three hundred twenty five dollars ($325) for the tertiary procedure. No additional payments for additional outpatient surgical or laparoscopic procedures performed shall be made.

3.     Except as to the terms and conditions updated by this Amendment, all of the terms and conditions of the Agreement are declared by the parties to be in full force and effect.

**IN WITNESS WHEREOF**, the parties hereto have caused this Amendment to be executed by their duly authorized officers.

CORRECTIONAL MEDICAL SERVICES, INC.

_____
Name

DAVID KANZLER
Print Name

CFO
Title

3/12/07
Date

CENTRAL MISSOURI MEDICAL PARK SURGICAL CENTER, LLC.

_____
Name

Angela Erosenko
Print Name

Facility Administrator
Title

03-05-07
Date

# CONTRACT INFORMATION SHEET

**Today's Date:** 12/21/15

**New Contract:** X

Letter of Agreement: _____

**Effective Date:** 12/1/15

Addendum / Amendment: _____

TERMINATION: _____

**Contractor:** Amenah

CHANGE: _____

FEE SCHEDULE : _____

**Contract Entity:** CMMP Surgical Center

**To Pay:** CMMP Surgical Center

Billing **1705 Christy Drive**

**Contact:** Angela Erosenko

Address: **Jefferson City, MO 65101**

Telephone: 573-635-7022

Fax: _____

Email: Aerosenko@surgerypartners.com

Physical **SAME**

SS #: _____

Address: _____

Tax ID: 43-1709558

Medicare Prov #: _____

NPI # (indiv): 1528060704

NPI # (group): _____

Service / Specialty: Surgical Services

**Payment /** **PROVIDER PAID BY - CLAIMS**

**Terms /** A Completed Claim must be submitted within (120) days of the service rendered.

**Penalties:**

Reimbursement – Claims for Health Care Services will be reimbursed at (150%) of the ASC Medicare

State of Missouri applicable current year geoadjusted fee schedule unless otherwise specified in this

Exhibit. Any codes not on the Medicare Fee Schedule shall be reimbursed at (45%) of Eligible Charges,

unless otherwise specified in this Exhibit.

CPT code C9290, Injectable Exparel shall be reimbursed at provider's cost. Invoice for injectable must

be submitted with claim.

Impantables shall be reimbursed the invoice cost plus (15%) upon receipt of valid invoice.

**Facility / Site:** **MO DOC**

**Region / State:** **MISSOURI**

| | | FOR PROVIDER OPERATIONS USE ONLY: | | |
|---|---|---|---|---|
| Timely filing limit: | X | CIS Reviewed | AM | 12/21/B |
| Timely payment limit: | | Fee Schedule Entered | | |
| Late payment penalty: | | FS Reviewed-Claims | | |
| MedicareGPCI: | X | Claims Adjusted | | |
| Refund: | | Fee Schedule Reviewed | | |
| Offset: | | | | |
| CMS Language: | X | | | |
| 23-hour Observation Language: | | | | |
| Lesser of Billed Charges Language: | X | | | |

CIS Form – Intended for Internal distribution only : 10/11

# ANCILLARY SERVICES AGREEMENT

### between

## CORIZON, LLC

### and

## CMMP SURGICAL Center, LLC

This Agreement is made and entered into this *1st* day of *Dec,* 2015, by and between Corizon, LLC., a Missouri Limited Liability Company with principal offices located at 103 Powell Court, Suite 104, Brentwood, TN, 37027, acting for itself or on behalf of any/all/other affiliated companies (hereinafter collectively referred to as "Corizon Health") and CMMP Surgical *Center* (hereinafter referred to as "Provider"), a health care provider located at 1705 Christy Drive, Ste. 100, Jefferson City, MO 65101 (hereinafter collectively referred to as the "Parties").

### WITNESSETH:

**WHEREAS,** Corizon Health has a contract to provide or arrange for the provision of Health Care Services to certain inmates and detainees under the control of Missouri Department of Corrections (hereinafter referred to as "Client"); and

**WHEREAS,** Provider is a licensed provider in the State of Missouri; and

**WHEREAS,** Corizon Health desires to engage, and Provider desires to provide Surgical Services to the correctional facility inmates and detainees in the custody of the Client, all on the terms and conditions set forth herein.

**NOW THEREFORE,** for and in consideration of the mutual covenants and promises as are hereinafter set forth and other good and valuable consideration, the sufficiency of which is hereby acknowledged by the Parties, Corizon Health and Provider hereby agree as follows:

### SECTION 1
### Definitions

**1.1** __Affiliated Entity__ means any entity who directly or indirectly through one (1) or more intermediaries, controls, or is controlled by, or is under common control with, Corizon Health.

**1.2** __Corizon Health/Client Contract__ means the agreement entered into between Corizon Health and the Client whereby Corizon Health has agreed to provide or arrange for the provision of Health Care Services to the inmates and detainees in the custody of the Client.

Case 2:22-cv-04191-MDH   Document 16-1   Filed 01/06/23   Page 49 of 60

**1.3** <u>**Corizon Health's Medical Director**</u> means the physician designated as the Corizon Health Medical Director for the correctional facility or facilities served under the Corizon Health/Client Contract.

**1.4** <u>**Completed Claim**</u> means a timely claim submitted on an industry standard claim form (CMS-1500 or UB-04), for reimbursement of Health Care Services which contains at least the following information:

1) Patient (Inmate) name and Department of Correction or Booking Identification number (Inmate Number).
2) Name and Address of Correctional Facility from which the inmate was transported.
3) Patient Date of Birth.
4) Date(s) of Service.
5) Provider Name, Address, Phone number, and Tax Identification number.
6) ICD-10 Diagnostic and Surgical Procedure codes and descriptions.
7) Current industry standard procedure coding (UB-04 Revenue Codes, DRG, HCPCS and CPT codes as appropriate) and descriptions.
8) Detailed billing of charges and units.

**1.5** <u>**Customary Charge**</u> means the usual and customary fees charged by Provider for the particular service that is performed, which do not exceed the fees Provider would charge any other person.

**1.6** <u>**Eligible Charges**</u> mean the amount of Provider's Customary Charges from which any reduction is taken for purposes of payment. Eligible Charges do not include amounts that are billed but that are duplicative, incorrectly coded, improperly coded, or that have similar defects, errors, irregularities or mistakes in billing. Eligible Charges also do not include charges for procedures or services that are not Medically Necessary or were unauthorized under this Agreement.

**1.7** <u>**Emergency Medical Condition**</u> means a medical condition manifesting itself by acute symptoms of sufficient severity such that the absence of immediate medical attention could reasonably be expected to result in placing the health of the Patient in serious jeopardy, serious impairment to bodily functions, or serious dysfunction of any bodily organ or part, or such other urgent condition that constitutes an Emergency Medical Condition.

**1.8** <u>**Emergency Services**</u> means those Health Care Services, which are Medically Necessary and provided for the treatment of an Emergency Medical Condition.

**1.9** <u>**Health Care Services**</u> means the hospital, physician, medical and related services and supplies provided to a Patient by Provider which are Medically Necessary and are requested by the Corizon Health contracted on-site physician.



**1.10** __Health Services Administrator (HSA)__ means the Corizon Health employee responsible for managing the medical program for the correctional facility or facilities served under the Corizon Health/Client Contract.

**1.11** __Medically Necessary__ describes those services which are determined to be: (a) appropriate for the treatment of the Patient's medical condition; (b) provided for the diagnosis or care and treatment of the Patient's medical condition; (c) in accordance with the applicable standards of good medical practice; (d) not elective or cosmetic or primarily for the convenience of the Patient, the Provider or any medical provider; and (e) the most appropriate and available supplier level of service that can be safely provided to the Patient.

**1.12** __Patient__ means those correctional facility inmate patients or detainees in the custody of the Client for whom Corizon Health has contracted to provide or arrange for the provision of Health Care Services pursuant to the Corizon Health/Client Contract.

## SECTION 2
### Provider's Rights and Obligations

**2.1** __General Engagement__. Corizon Health hereby engages Provider to provide Health Care Services to Patients, and Provider hereby accepts such engagement according to the terms and conditions of this Agreement.

**2.2** __Time and Place of Services__. Provider agrees to provide and/or make available Health Care Services at Provider's office or other usual and customary site for rendering Health Care Services and in accordance with Provider's usual and customary schedule for rendering Health Care Services.

**2.3** __Qualifications__. Provider represents that Provider possesses a current and unrestricted license to provide surgical services in the State of Missouri. Provider also represents that Provider possesses current and unrestricted controlled substance certification, if applicable. Provider agrees to comply at all times with all applicable federal, state, and local laws, and other regulatory and certification requirements, which govern Provider's business. Provider further agrees to notify Corizon Health immediately if Provider receives notice of noncompliance with such requirements, conditions and standards, or if Provider's qualification status is changed in any respect. Surgery Center also agrees to notify Corizon Health immediately in the event that Physician's credentialing status or level of privileges is reduced, suspended, terminated, or in any way diminished at surgery center or other health care facility, or within any network, provider group, or other such professional association or society. Provider agrees to provide timely notice to Corizon Health of any action and/or change in status that is known or should be known by the Provider and could reasonably impact the license of Provider's employee/agent providing onsite care at Facility. Provider's failure to meet or maintain the required qualifications may result in immediate termination of this Agreement.

**2.4** **Utilization Review**. Provider will ensure that services rendered are reasonable and medically necessary. Provider will permit Corizon Health to review services rendered and will provide Corizon Health with patient information and documents necessary for utilization management functions. Provider will honor Corizon Health's request for medical records. Provider acknowledges and understands that payment for unauthorized or inappropriate services may be adjusted or denied by Corizon Health. Disputed claims adjudication may be appealed in accordance with the appeals process set forth in Section 3.3 below.

**2.5** **Quality Assurance**. Provider shall ensure the application of a quality assurance process that utilizes appropriate quality of care standards. Provider will also ensure that appropriate quality assurance review activity, including subsequent action taken by the Provider, will occur for quality of care issues referred by Corizon Health. Provider shall make available for review and examination by Corizon Health's Medical Director or his or her designee, upon request, specific documentation to evidence Provider's adherence to quality of care standards as they may reasonably relate to the Health Care Services rendered to Patients hereunder.

**2.6** **Compliance with Applicable Law**. Provider agrees that all Health Care Services provided by or through Provider pursuant to this Agreement, and documentation thereof, will be in compliance with applicable law and certification or licensure requirements.

**2.7** **Security**. Provider shall cooperate with all necessary security arrangements whether provided by the Client or such other duly qualified security or law enforcement agency.

**SECTION 3**
**Compensation of Provider**

**3.1** **Compensation for Services**. Provider will be compensated for Health Care Services rendered at the lesser of Eligible Charges or as set forth in the Compensation Schedule, attached hereto as Exhibit A.

**3.1.1** **Claims Review**. Completed Claims for professional services are reviewed by a clinical software system during payment processing. This review detects, corrects, and documents improper coding, including unbundling, upcoding, and fragmentation using Medicare National Correct Coding Initiative and/or CPT coding guidelines, and adjusts reimbursement accordingly. Completed Claims questioned by the clinical software may be reviewed by a nurse analyst and appropriate documentation to substantiate questioned charge(s) may then be requested.

**3.2** **Claims Submission**. To be eligible for compensation under this Agreement, Provider must submit a Completed Claim for each episode of Health Care Services provided to a Patient. A Completed Claim must be submitted within one hundred twenty (120) days of the service rendered. Completed Claims submitted after one hundred twenty (120) days shall be permanently denied.

Case 2:22-cv-04191-MDH   Document 16-1   Filed 01/06/23   Page 52 of 60

Corizon Health accepts the electronic filing of claim forms. When submitting CMS-1500 forms via an electronic format, Physician should use the Corizon Health payer identification number 43160.

Completed Claims in paper form should be sent to the following address:

> Corizon Health
> PO Box 981639
> El Paso, TX 79998

> Or such other address as Provider is notified by Corizon Health.

To inquire about the status of claims submitted, please call Corizon Health Customer Service at 888-865-2910. Customer Service hours are Monday through Friday, 7:30 am to 5:30 pm (CST) or 24/7 access may be obtained by accessing the Corizon Partner Portal at www.CorizonHealth.com.

**3.3** **Appeal Process**. In the event that a dispute arises concerning the resolution of a Completed Claim, Provider may appeal by submitting the dispute to Corizon Health in writing, with supporting documentation, within forty five (45) calendar days following Corizon Health's response or denial of the Completed Claim. Corizon Health shall provide a reply within sixty (60) days and Provider shall initiate appropriate action, if any, within forty five (45) days following receipt of Corizon Health's response. If Provider fails to dispute in writing Corizon Health's handling of a Completed Claim within forty five (45) calendar days following receipt of Corizon Health's response, then such claim may be considered waived and Corizon Health shall not be obligated to make any payment or adjustment thereafter.

**3.4** **Patient Verification**. Except for Emergency Services, Provider will not provide Health Care Services to any Patient unless the Patient has been referred for care by the Corizon Health contracted on-site physician. Provider is responsible for verifying that an individual who presents for services is a Patient and has been referred by the Corizon Health contracted on-site physician to the Provider for Health Care Services.

**3.5** **Right of Recovery**. Provider will not seek reimbursement from the Patient or from the Client without Corizon Health's written consent.

**3.6** **Prior Services & Payments**. If Provider has performed services for Corizon Health Patients prior to the Effective Date of this Agreement, and Corizon Health has compensated Provider for these services, Provider agrees to accept the amounts previously paid by Corizon Health as full and final reimbursement for services rendered prior to the Effective Date of this Agreement.

**SECTION 4**
**Term and Termination**

Case 2:22-cv-04191-MDH   Document 16-1   Filed 01/06/23   Page 53 of 60

**4.1** <u>Term</u>. The term of this Agreement will commence on the Effective Date and will continue in effect for one (1) year ("Initial Term") and shall automatically renew for recurring one (1) year terms thereafter, unless either Party, at least thirty (30) days prior to the expiration date, notifies the other in writing of its desire not to extend or renew this Agreement.

**4.2** <u>Termination</u>. This Agreement may be terminated as follows:

**4.2.1** <u>Termination without Cause</u>. Either party may terminate this Agreement, without cause, by giving the other party written notice of termination, not less than ninety (90) days prior to the effective date thereof.

**4.2.2** <u>Termination for Cause</u>. Corizon Health may terminate this Agreement with Provider for cause, including but not limited to the occurrence of any of the following events, which has not been cured within thirty (30) days after written notice from Corizon Health.

4.2.2.1 Provider has breached any of the material terms and conditions of this Agreement or the exhibits or attachments hereto; or

4.2.2.2 Any activities or actions of Provider that, in the reasonable judgment of Corizon Health, are deemed to be detrimental to Corizon Health.

**4.2.3** <u>Immediate Termination</u>. Corizon Health may immediately terminate this Agreement upon the occurrence of any of the following events:

4.2.3.1 Provider's failure to maintain required insurance as provided in this Agreement; or

4.2.3.2 Provider's inability to meet its obligations pursuant to this Agreement due to financial insolvency, bankruptcy, or lack of capacity to provide Health Care Services; or

4.2.3.3 Provider is found guilty of a criminal offense; or

4.2.3.4 Provider is found liable for gross misconduct in providing care.

**4.3** <u>Services Subsequent to Termination</u>. Section removed intentionaly

### SECTION 5
### Insurance and Indemnification

**5.1** <u>Insurance.</u> At all times during the term of this Agreement and any renewals hereof, Provider shall maintain or cause to be maintained adequate professional liability insurance policies or self-insurance with limits of not less than one million dollars ($1,000,000) per

Case 2:22-cv-04191-MDH   Document 16-1   Filed 01/06/23   Page 54 of 60

occurrence and three million dollars ($3,000,000) in annual aggregate, and such insurance shall provide occurrence-based coverage, or if it provides claims-made coverage, Provider agrees that upon the expiration or termination of this Agreement for any reason, Provider will maintain insurance coverage for any liability directly or indirectly resulting from Provider's provision of services in connection with this Agreement, or any other acts or omissions of Provider occurring in whole or in part during the term of this Agreement (hereinafter "Continuing Coverage"). Provider may procure Continuing Coverage by obtaining subsequent policies which have a retroactive date of coverage equal to the Effective Date of this Agreement, by obtaining an extended reporting endorsement ("tail") applicable to the insurance coverage maintained by Provider during the term of this Agreement, or by such other methods as are mutually agreed upon by Provider and Corizon Health. In addition, Provider agrees to procure and maintain, at its sole expense, such comprehensive general and/or umbrella liability insurance as Provider shall reasonably deem necessary to cover its potential general liability risk exposure. Provider shall require all health care professionals employed by or under contract with Provider to procure or maintain the same limits of professional liability insurance as set forth above, unless such professionals are covered under Provider's insurance policy.

The insurance obtained pursuant to this Section, including any Continuing Coverage, will cover all employees and agents of Provider who provide Health Care Services to Patients, against any and all claims, actions, judgments, liabilities, losses, damages, costs, and obligations (including attorney's fees) which are attributable to or which arise, directly or indirectly, out of any act or omission by Provider and/or its employees, physicians, or agents. Provider will assume responsibility to ensure that physicians have adequate professional liability insurance policies or self-insurance with limits of not less than one million dollars ($1,000,000) per occurrence and three million dollars ($3,000,000) in annual aggregate in place prior to providing health care services to patients. Without limiting the obligations of Provider under this Section, the insurance maintained or caused to be maintained pursuant to this Section will provide coverage against civil actions based on medical treatment brought under 42 U.S.C. § 1983, and as that statute may be amended, modified, recodified, or succeeded in the future. The obligations of this Section concerning Continuing Coverage shall survive termination of this Agreement.

**5.2 Corizon Health's Insurance**. At all times during the term of this Agreement and any renewals hereof, Corizon Health shall maintain professional liability policies of insurance in amounts and with coverage similar to that required of Provider hereunder.

**5.3 Certifications.** Provider shall, within ten (10) days after execution of this Agreement and on an annual basis thereafter, provide to Corizon Health certificates issued by an insurance carrier or its agent or other evidence of insurance as required under this Agreement. Provider shall provide Corizon Health with at least thirty (30) days prior written notice of any modification, cancellation, or non-renewal of such policies.

**5.4 Hold Harmless and Indemnification.** Corizon Health agrees to indemnify and hold harmless Provider and its agents and employees from any and all claims, damages and lawsuits of any kind whatsoever based upon the acts and omissions of Corizon Health and any of its staff members, employees or agents.

Provider agrees to indemnify and hold harmless Corizon Health and its agents and employees from any and all claims, damages and lawsuits of any kind whatsoever based upon the acts or omissions of Provider or any of its staff members, employees or agents.

## SECTION 6
### Relationship of the Parties

**6.1    Relationship of the Parties**.  The relationship of Provider to Corizon Health is that of independent contractor.  Nothing contained herein shall create an employer-employee, principal-agent, or partnership relationship between Corizon Health and Provider or between Corizon Health and any employee, agent, or physicians of Provider.  Corizon Health shall not exercise control or direction over the manner in which Provider or any employee, agent, or physician of Provider renders services.  Nothing contained herein shall interfere with the provider-patient relationship between Provider and any patient, including the Patients under this Agreement, or with Provider's legal or ethical obligation to provide the proper standard of care to Patients.

**6.2    Confidential Information.**  Provider agrees not to disclose or in any way use, or allow any other person to disclose or use, confidential information of or concerning Corizon Health or the various facilities either during or after the term of this Agreement without Corizon Health's prior express written consent.  Confidential information includes, but is not limited to, legal or claim data, financial data, methods of operation, policies and procedures. Provider shall not copy or remove Corizon Health documents for its own use or for the use of others, nor shall Provider make use of or allow or assist any other person or company to make use of any Corizon Health procedure or program, including but not limited to those relating to utilization review or quality improvement, except as authorized under this Agreement.   Provider shall not disclose, or allow others to disclose, the terms of this Agreement, except, as it is necessary to perform this Agreement or to obtain accounting, legal or tax advice from its professional advisors. This Section shall survive termination of this Agreement.

**6.3    Non-Exclusivity**.  This Agreement is a non-exclusive arrangement.  Provider may participate in other affiliations and render such other Health Care Services as Provider determines.  Provider acknowledges that Corizon Health must contract with other health care providers, including hospitals, for the purpose of fulfilling its obligations pursuant to the Corizon Health/Client Contract.

**6.4    Medical Records**.  Provider agrees to prepare comprehensive medical records for each Patient to whom Provider provides Health Care Services. Each such medical record shall contain sufficient information to identify the Patient, establish a diagnosis and medical classification, support the diagnosis, identify and justify the treatment, and document the results of such treatment. Medical records prepared by Provider during the term of this Agreement will be kept confidential by Provider and shall be maintained in accordance with applicable state and federal laws governing confidentiality.   Provider will allow Corizon Health and its health care professionals access to such medical records without cost to Corizon Health. This Section shall survive termination of this Agreement.

Case 2:22-cv-04191-MDH   Document 16-1   Filed 01/06/23   Page 56 of 60

## SECTION 7
## Construction of Agreement

**7.1** <u>Assignment</u>. The Parties to this Agreement may not assign, sell or transfer any of their rights or responsibilities under this Agreement without the prior written consent of the other party; provided however, that Corizon Health may assign this Agreement and all its rights and responsibilities hereunder to any Affiliated Entity, as defined above, without Provider's prior written consent.

**7.2** <u>Amendments</u>. This Agreement may be amended only by written agreement signed by the Parties hereto.

**7.3** <u>Section Headings</u>. The headings of sections in this Agreement are for reference only and shall not affect the meaning of this Agreement.

**7.4** <u>Entire Agreement</u>. This Agreement, inclusive of any and all amendments, attachments and exhibits incorporated herein by reference, constitutes the entire understanding and agreement between the parties with regard to the subject matter hereof. No other prior or contemporaneous promise, obligation, statement or understanding between the parties, whether written or oral, shall be valid or binding.

**7.5** <u>Binding Effect</u>. This Agreement shall be binding upon and inure to the benefit of each party hereto, and their successors and permitted assigns. No party may assign this Agreement, except as specifically provided otherwise herein.

**7.6** <u>No Third Party Beneficiary Rights</u>. No patient, nor the Client, nor any other third party shall have any third party beneficiary rights hereunder.

**7.7** <u>Non-Waiver.</u> Failure to insist upon strict compliance with any of the terms or conditions of this Agreement shall not be deemed to be a waiver in the event of any future breach of any term or condition hereunder.

**7.8** <u>Severability</u>. Should any provision (or part thereof) of this Agreement be held to be invalid and/or unenforceable, the remaining provisions shall remain in full force and effect.

**7.9** <u>Notices</u>. Any notice required hereunder (including notice of an amendment of this Agreement) shall be sent by registered or certified mail (return receipt requested), personal delivery, overnight commercial carrier, or other guaranteed delivery. The notice shall be effective as of the date of delivery if the notice is personally delivered, or the date of receipt or refusal to accept delivery if the notice is forwarded by other means. Unless otherwise specified, notices shall be sent to:

(form rev. 10/4/2011; 8/30/12)

9



**Corizon Health**
Corizon Health
103 Powell Court, Suite 104
Brentwood, TN 37027
Attn: Therese Brumfield, Vice President Provider Operations

With a courtesy copy to the Attn: General Counsel

**Provider**
CMMP Surgical Center
1705 Christy Dr. Ste. 100
Jefferson City, MO 65101
Attn: Angela Erosenko
E-mail: AErosenko@surgerypartners.com

**7.10** <u>Non-Discrimination</u>. Provider shall not discriminate on the basis of race, color, sex, religion, national origin, ethnic group, age or disability.

**7.11** <u>Multiple Counterparts.</u> This Agreement may be executed in multiple counterparts, each of which shall be deemed to be an original and all of which taken together shall constitute a single instrument.

**7.12** <u>Name, Symbol and Service Mark</u>. During the term of this Agreement, Corizon Health shall have the right to use Provider's name solely to make public reference to Provider as a contracted provider for Client. Provider and Corizon Health shall not otherwise use each other's name, symbol or service mark without prior written approval.

**7.13** <u>Applicable Law.</u> For conflict of law purposes, the laws of the State of Missouri shall apply in interpreting the terms of this Agreement.

Case 2:22-cv-04191-MDH   Document 16-1   Filed 01/06/23   Page 58 of 60



**IN WITNESS WHEREOF**, the parties have executed this Agreement effective as of that Commencement Date first above written.

**CORIZON, LLC.**

By: Ralf Salke

_(signature)_

Vice President, Operations

Date: 12-18-15

By: Amenah Martin

_(signature)_

Contract Specialist

Date: 11/10/15

By: M. Therese Bramfield

_(signature)_

Vice President, Provider Operations

Date: 12-14-15

**CMMP SURGICAL CENTER, LLC**

By:

_(signature)_

Signature

Facility Administrator

Title

Print Name: CMMP Surgical Center

Date: 11-04-2015

TIN: 43-1709558

NPI: 1528060704

# Contract Distribution Check List

Please distribute this contract to the departments/individuals checked below when Fully Executed

**Provider:** _Cimm Surgical_  HSP [ ]  ANC [✓]  PHY [ ]
**Contractor:** _Fillmore___Perry_  IC [ ]  SUB [ ]

| Claims Dept: | Payable by Claims | [✓] | | |
|---|---|---|---|---|
| **Position** | **Contact** | | *Admin Initials* | |
| Director | Paula G. | [✓] | [ ] | |
| Manager | Drew F. | [✓] | [ ] | |
| Configuration | April | [✓] | [ ] | |
| | Nanette | [✓] | [ ] | |
| | Ontee T | [✓] | [ ] | |
| Audit | Deb Jones | [✓] | [ ] | |
| **Accounts Payable** | **Payable by AP** | | | |
| Manager | Alva W. | [ ] | [ ] | |
| Supervisor | Melissa D. | [ ] | [ ] | |
| **Payroll** | | | | |
| HRIS E-Mail | | [ ] | | |
| **Recruiting** | | | | |
| Director, Prov Recruiting | Courtney P. | [ ] | [ ] | |
| Recruiters | Kim B. | [ ] | [ ] | |
| | Randy B. | | | |
| | Blake B. | | | |
| | Erik H. | | | |
| | Alex K. | | | |
| | John P. | | | |
| | Kris R. | | | |
| | Dee T. | | | |
| | Stephanie Y. | [ ] | [ ] | |
| **Accounting** | | | | |
| Director, Ops Accounting | Ashley R. | [ ] | [ ] | |
| | Jennifer B. | [ ] | [ ] | Rebates [ ] |
| | Julia S. | [ ] | [ ] | Fixed Rates |
| Director, Corp Accounting | Ashley B. | [ ] | [ ] | Hospital [ ] |
| Corp Accountant | Anita D. | [ ] | [ ] | |
| Corp Accountant | Erica G. | [ ] | [ ] | |
| **Utilization Management** | | | | |
| Directors, UM | Feli L. | [ ] | [ ] | |
| | Mignon (Lori) E. | [ ] | [ ] | Hospital [ ] |
| | Sharon F | [ ] | [ ] | |
| Vice President, UM | | [ ] | [ ] | |
| **Provider Operations** | | | | |
| Director, Provider Rel | DeeDee | [✓] | [ ] | |
| Contract Specialist | Amenah | [✓] | [ ] | |
| | Robin | [ ] | [ ] | |
| | LaTonya | [ ] | [ ] | |
| | Paolo | [ ] | [ ] | |
| | Carla | [ ] | [ ] | |
| | Terry | [ ] | [ ] | |
| **Field Operations** | | | | |
| Vice President Operations | _Ralf Selke_ (contractor write-in) | [✓] | [ ] | |
| Regional Admin Assistant | _Shelley Frye_ (contractor write-in) | [✓] | [ ] | |
| Health Service Admin (HSA) | _____ (contractor write-in) | [ ] | [ ] | |

**Dist. Completion Date:** _____